Nell SIMPSON, et al., Relators,

v.

Hon. Adolph CANALES, Judge of the 298th District Court of Dallas County, Texas, Respondent.

No. C–9256.

Supreme Court of Texas.

April 3, 1991.

R. Brent Cooper, Cowles & Thompson, Dallas, O.J. Weber, Mehaffey & Weber, Beaumont, Timothy E. Kelley, Kelley & Bates, A.P.C., Dallas, Miles J. Zaremski, Arnstein & Lehr, Chicago, Ill., Don Martinson, Fanning, Harper & Martinson, Dale B. Tillery, Edwards & Tillery, Charles T. Frazier, Jr., Cowles & Thompson, Dallas, for relators.

J. Karl Viehman, Strasburger & Price, Dallas, David M. Stagner, Stagner & Stagner, Sherman, Thomas L. Cox, Jr., James Wm. Walker, Arter, Hadden & Witts, Terry L. Jacobson, Thompson & Knight, Mark A. Calhoun, Calhoun, Gump, Spillman & Stacy, Charles G. Bell, Newton, Bell & Jones, Scott Smith, Smith, Smith, Smith & Henderson, Vester T. Hughes, Jr., Hughes & Luce, Dallas, for respondent.

## OPINION

HECHT, Justice.

In this original mandamus proceeding we consider the authority of a trial court under Rule 171 of the Texas Rules of Civil Procedure to appoint a master to supervise pretrial discovery in a case. Joining in the petition for mandamus are the plaintiff and several of the defendants in a wrongful death case pending before the respondent district court. For reasons that follow, we conclude that the district court has exceeded its authority, and therefore we conditionally grant the writ of mandamus.

## I

This proceeding arises out of a lawsuit pending in the 298th District Court of Dallas County, brought by Nell Simpson to recover damages for the wrongful death of her husband.[1] Simpson's eight-page petition alleges that her husband died of lung cancer caused by exposure to toxic chemicals present in various products designed, manufactured or marketed by eighteen

---

1. This action is Cause No. 88–16085–M. Nell Simpson is suing on behalf of herself, her husband's estate, her and her husband's twin daughters, and all statutory beneficiaries.

named defendants.[2] Several of the defendants have filed cross-actions against one another.

Six months after suit was filed the trial court issued the following order unrequested by any party:

The Court after reviewing the pleading and motions on file herein, finds that there is a need for a master to assist the Court and to supervise all pre-trial discovery in this Cause.

It is, therefore, ORDERED that Gary Sibley, Esq., is appointed as special master to oversee pre-trial discovery, conduct hearings and make rulings in writing on all pre-trial discovery matters in the above-styled and numbered cause. Special Master Gary Sibley, Esq. shall be compensated at the rate of $175.00 per hour, to be paid one-half (½) by the Plaintiffs and one-half (½) in equal shares by all Defendants. Billings shall be submitted every two weeks and are payable by the parties immediately upon receipt. Any objections to the Master's rulings shall be filed with the Court within ten (10) days of the signing of said rulings by the Master, or they shall be waived. The Special Master shall have all the powers authorized by Rule 171 of the TRCP, in addition to those set forth herein, to fully carry out the intent of this order.

What may have provoked the trial court to issue this order is unclear from the record before us. The parties acknowledge that numerous discovery requests were made after the suit commenced and that eight discovery motions requiring a hearing were filed in the first ten months of the litigation. While this is more activity than might be found in many cases, it is certainly not extraordinary. The record does not reflect that the trial court heard any of these motions before issuing its order appointing a special master.

Plaintiff moved the trial court to modify the order to relieve her of the obligation to pay for half the fees of the special master, asserting by affidavit that she lacked the financial resources to do so. The day after plaintiff's motion was filed, the special master appointed by the trial court directed a letter to all counsel of record instructing them to attend a scheduling conference which he had set without the request of any party and apparently without any prompting by the trial court. The letter also stated:

The Court has ordered $10,000 deposited in trust to cover master fees incurred in this case. The amount is to be paid $5,000 each by Plaintiffs and Defendants. Please bring a check for your client's pro rata share made payable to "Simpson v. PPG Master Trust Account" as well as ten stamped, self-addressed envelopes.

The special master's statement that the court had ordered the parties to make a $10,000 deposit was simply incorrect; the record does not reflect that the trial court ever issued such an order. In directing the parties to present their checks for payment of this sum, the master was acting entirely upon his own.

One of the defendants, later joined by several others, then filed an objection asserting that the appointment of a special master was unauthorized and unnecessary. The objecting defendants urged that the complexity of the case did not justify the appointment, that the court was not authorized to require the parties to pay the master's fees, and that the court itself had a duty to hear and rule on discovery matters.

At a hearing on plaintiff's motion and defendants' objection, only one defendant stated that it did not object to the appointment of the master. All defendants represented at the hearing opposed the plaintiff's request that she not be required to

---

**2.** Of the eighteen defendants, nine have joined Simpson in petitioning for mandamus relief: Lilly Industrial Coatings, Inc.; Amchem Products, Inc.; Carroll Company; Jones Blair Paint Company; DeSoto, Inc.; E.I. Du Pont de Nemours & Co. (Inc.); NCH Corporation; PPG Industries, Inc.; and Specialty Coatings Company, Inc. The other nine defendants are: Whittaker Corporation; The Dexter Corporation; Mameco International, Inc.; The B.F. Goodrich Co.; Vinylex Corporation; Union Carbide; Owens-Corning Fiberglas Corporation; United Resin Adhesives, Inc.; and Vulcan Materials Co.

pay any part of the master's fees. During the hearing the trial court stated:

> Well, let the Order be—so reflect in the future, the Master is appointed pursuant to Rule 171 of the Texas Rules of Civil Procedure, in the discovery matters, not because they are complex, but because they are so numerous, the documents are so numerous, and take up so much of the Court's time, the Court does not have the time to efficiently handle the administration of this Court's business, and therefore is appointing a Master to aid the Court in pre-trial discovery matters in this case, and the Order stands.

Following the hearing, the trial court issued an amended order finding, somewhat contrary to the statement just quoted, that the issues in the case were complex, and modifying the payments to be made to the master. The amended order states:

> The Court, after reviewing the pleadings and Motions on file herein and listening to the evidence and argument of counsel, finds that this is an exceptional case involving eighteen defendants against which the Plaintiff has alleged various toxic tort and product liability causes of action, some of which began in 1964 and continued thereafter. The issues are multitudinous and complex. The Defendants have filed counter-claims against one another and have alleged various affirmative defenses to Plaintiffs' action. Defendants have been served with discovery requests and have each alleged numerous objections.

> Because of the complex nature of the case and the numerous pre-trial issues to be disposed of, the Court finds that good cause exists for the appointment of a Master in Chancery under the provisions of Tex.R.Civ.P. 171, and that the increased expense of proceedings before the Master will result in offsetting benefits to the parties and the state through a reduction in the complexities of trial and pre-trial proceedings.

> The Court finds that Gary Sibley is a citizen of the State of Texas, is not an attorney for or related to any of the parties and should be appointed Master and given all powers allowed a Master in Chancery by Tex.R.Civ.P. 177.

> IT IS, THEREFORE, ORDERED that Defendants' objections to appointment of a Master are overruled and that Gary Sibley is appointed Master in Chancery and given all powers conferred on such master by Tex.R.Civ.P. 171. The Master shall be compensated at the rate of $175.00 per hour. A trust account shall be established by the Master in a federally insured banking institution in Dallas County, Texas. The initial assessment to be paid to the trust account by the parties shall be paid $200.00 per month by the Plaintiffs and $550.00 each by the Defendants no later than September 15, 1989. Additional assessments shall be paid by the Defendants when the trust account balance in $3,000.00 or less. The Master shall submit statements to the Court for services rendered prior to withdrawing funds and may withdraw funds as due, every two weeks during the course of litigation. The Master's fees shall be taxed as costs of court or as directed by the court.

> IT IS FURTHER ORDERED that any objections to Master's rulings shall be filed with the Court within ten (10) days of the signing of said ruling by the Master, or any objection shall be waived.

Plaintiff filed a motion in the court of appeals for leave to file a petition for writ of mandamus directing the trial court to vacate this order. The appeals court denied the motion. Nine of the defendants filed their motion in the court of appeals requesting the same relief. The appeals court denied their motion, also. Plaintiff and these defendants then filed in this Court a joint motion for leave to petition for mandamus relief, which we granted.

II

"The courts of Texas have not had occasion to develop an extensive body of law with respect to masters." 3 R. McDONALD, TEXAS CIVIL PRACTICE IN DISTRICT AND COUNTY COURTS § 10.17.1, at 28 (F. Elliott rev. 1983); *see also* Moore, *The Use of Masters in Chancery in Texas Courts*, 53 TEX.B.J.

442 (1990). Other jurisdictions, however, especially the English courts and the federal courts in this country, have had very considerable experience with the use of court masters. We therefore begin by examining their experience before applying our own law in this case.

### A

The office of master in chancery—a person designated to hear certain matters referred by a judicial officer—is among the oldest institutions of the common law, having been introduced into England by the Normans. *See United States v. Manning*, 215 F.Supp. 272, 292–93 (W.D.La.1963) (opinion by Wisdom, C.J., for a three-judge court); Ball, *The Chancery Master*, 77 L.Q. REV. 331, 332 (1961). The role of master in chancery is similar to, and may have been patterned after, that of the judex of early Roman law, who was a private person appointed by a praetor with the consent of the parties to a cause of action, to hear and decide the dispute. *See id.;* 1 W. HOLDSWORTH, A HISTORY OF ENGLISH LAW 418 (7th ed. rev., reprinted 1966); BLACK'S LAW DICTIONARY 840 (6th ed. 1990).

In late medieval England, masters in chancery—earlier called clerks in chancery—were used primarily to assist the Chancellor in the exercise of his growing jurisdiction over matters in equity and some common law actions. Masters issued writs, examined witnesses, heard disputes, and reported their findings back to the Chancellor. *See* 1 W. HOLDSWORTH, *supra*, at 418–19; Ball, *supra*, at 332–35. Masters were not to substitute for the Chancellor but to aid him. *See* Silberman, *Masters and Magistrates, Part II: The American Analogue*, 50 N.Y.U.L.REV. 1297, 1322 n. 149 (1975).

As the Chancellor's power increased under the reign of the Tudors, so did the masters'. *See* 1 W. HOLDSWORTH, *supra*, at 409–16, 419–23. King Henry VIII formalized the office, appointing twelve masters in chancery, and that number remained traditional for centuries. The number of their clerks, deputies and other staff members, however, continued to grow. *Id.* at 416–23. The masters derived their authority largely from the inherent power of the Chancellor rather than from any statute. In time, the involvement of the masters in the conduct of equity and some common law litigation in England was pervasive. *Id.*

This systematic use of masters in chancery never functioned well. The reasons are numerous and complex, but principal among them, perhaps, is that the system suffered abuses due to the fact that masters were paid out of fees charged for work done. 1 HOLDSWORTH, *supra*, at 424–45. Separate fees were charged for all work done by the master—for each writ issued, each copy made, each pretrial hearing held, and each report prepared. It thus behooved a master or his deputy to involve himself in each matter as deeply as he could and draw out the pretrial proceedings as long as possible.[3] As Holdsworth describes:

> A tale related by Sir John Bramston in his Autobiography is perhaps the best illustration of the effects of these abuses upon the ordinary litigant. He tells us that during the civil war his grandmother had begun a suit in Chancery to recover some tithes to which she was entitled. She died, and he continued the action. The amount in dispute was £4. "It cost, to recover that £4, £200 at least."

*Id.* at 428.[4] Although similar abuses could be found among the common law courts for

---

3. "Another device utilized by masters to increase their earnings was that of deliberately delaying the proceedings and then charging a special fee for acceleration." Kaufman, *Masters in the Federal Courts: Rule 53*, 50 COLUM.L.REV. 452 n. 4 (1958). This practice was called "heraldry". Ball, *supra*, at 338.

4. This is only one of several examples Holdsworth relates, another of which is:

> As a concrete instance of the effects of this system let us take the bill of costs in the case of *Morgan v. Lord Clarendon*, which was analysed by Mr. Winter in his evidence before the Chancery commission. This case had begun in 1808, and in 1824 it was still proceeding. The whole of the bills of cost up to that date amounted to £3,719 19s. 2d. Deducting the stamp duties, it amounted to £3,590 18s. 10d. The expenses of the master's office alone were

similar reasons, the effects of the abuses in the chancery courts seem to have been worse.[5] *Id.* at 424–28. Despite repeated efforts of kings and parliaments to correct such abuses, they persisted well into the nineteenth century until the use of masters in chancery was reformed by statute in 1852.[6]

When the Court of Chancery Act was passed in 1852, "proceedings before the Masters ... were attended with great delay and expense and it was expedient that their business should be transacted by and under the more immediate direction and control of the Judges of the court." Ball, *supra*, at 342. This Act and other nineteenth century statutory reforms were aimed at circumscribing the power of masters and eliminating abuses in their use while preserving their helpful functions.

Masters remain an established part of the English court system, but in a different setting. They are no longer paid by fees assessed against the parties but are salaried employees of courts. They have been made into a lower level judiciary, heavily involved in pretrial proceedings and working closely with judges in preparing cases for final disposition. Their function is comparable in many respects to federal court magistrates in this country and similar officers of state courts. *See* Silberman, *Masters and Magistrates Part I: The English Model,* 50 N.Y.U.L.Rev. 1070 (1975); Ball, *supra,* at 347–55; Diamond, *The Queen's Bench Master,* 76 L.Q.Rev. 504 (1960).

**B**

The experience of American courts with masters in chancery has closely resembled the experience of English courts. American colonial courts, following their English precursors, used masters in chancery extensively, as did later state and federal courts. *See* Brazil, *Authority to Refer Discovery Tasks to Special Masters: Limitations on Existing Sources and the Need for a New Federal Rule,* in W. Brazil, G. Hazard & P. Rice, Managing Complex Litigation: A Practical Guide to the Use of Special Masters 305, 337–40 (1983); Silberman, *supra,* 50 N.Y.U.L.Rev. at 1321–22; Kaufman, *supra* n. 3, at 452. The authority for using masters, when not provided by statute or rule, was often considered to be based upon the inherent power of a court. *See* Brazil, *supra,* at 364–68; *Ex parte Peterson,* 253 U.S. 300, 312, 40 S.Ct. 543, 547, 64 L.Ed. 919 (1920).[7]

£1,716 8s. 10d., being nearly half the expenses of the whole suit. In this case no counsel had been employed before the master, so that these expenses included simply the expenses of the master, his clerk, and six solicitors for ordinary routine work. Of this sum £799 19s. 6d. was paid to the master, and £39 18s. as gratuities to his clerk; so that the fees paid to the master and his clerk were nearly half as much as were paid to the whole of the six solicitors in the case. Moreover, it appeared that the fees paid to the master were only £249 less than the fees paid to counsel and all of the other officials of the court put together. It would seem, therefore, that, at the beginning of the nineteenth century, as at the beginning of the eighteenth century, the procedure in the master's offices was the "very worst part of the business of the court."

9 Holdsworth, *supra,* at 365.

**5.** The full responsibility for the abuses in the chancery courts cannot, of course, be laid at the feet of masters in chancery. There were many economic and political pressures which contributed to the problems. *See* Ball, *supra,* at 337–42.

**6.** "[T]he Chancery Commission of 1850 recommended the abolition of masters in chancery, describing the system as follows:

[The] procedure in the Master's Office in a simple case ... is obviously calculated to cause unnecessary delay and expense. The system had its origin at a time when the Masters and their clerks were paid by fees. Every warrant, every copy, every report, indeed every proceeding carried its fee, small perhaps in individual amount, but the multiplication of which pressed heavily on the suitor and yielded large emoluments to the officers.

Kaufman, *supra* n. 3, at 452 n. 4.

**7.** "Courts have, in the absence of prohibition, inherent power to provide themselves with the instruments required for the performance of their duties.... This power includes authority to appoint persons unconnected with the court to aid judges in the performance of specific judicial duties as they may arise in the progress of a cause. From the commencement of our Government, it has been exercised by the federal courts, when sitting in equity, by appointing, either with or without the consent of the parties, special masters, auditors, examiners and commissioners."

As the role of these masters—sometimes referred to as auditors or commissioners—increased in the nineteenth century, so did dissatisfaction with the procedure. Brazil, *supra*, at 339–40. At the beginning of the present century, criticism .of the use of masters in the federal courts, as distinct from complaints about equity procedure generally, focused on two problems. First, although every reference of a matter to a master necessarily involves a delegation of some judicial authority, "a judge who wanted to could leave the real decision making to the master." *See id.* at 339. Second, the use of masters "add[s] appreciably to the cost and length of litigation. Litigants should not be burdened with the costs of referring matters which the judge might easily hear and determine for himself." *Id.; see* 9 C. WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE § 2601, at 776–77, and § 2603, at 780–81 (1971).

In response to this criticism, the United States Supreme Court in 1912 revised equity procedure in the federal courts. Brazil, *supra*, at 341–45. Included among the reforms was the following limitation on the use of masters: "Save in matters of account, a reference to a master shall be the exception, not the rule, and shall be made only upon a showing that some exceptional condition requires it." Rule 59, Rules of Practice for the Courts of Equity of the United States, 226 U.S. 649, 666 (1912). The purpose of Rule 59 was to authorize the use of masters "primarily, if not exclusively, to render well-focused assistance with specific issues", Brazil, *supra*, at 343, and to avoid the delay, expense and judicial insulation from direct involvement in the proceedings which had marked the broader use of masters in the past. Twenty-six years later when the Federal Rules of Civil Procedure were adopted, this limitation, with some refinements, was included in Rule 53(b), which now provides in pertinent part:

A reference to a master shall be the exception and not the rule. In actions to be tried by a jury, a reference shall be made only when the issues are complicated; in actions to be tried without a jury, save in matters of account and of difficult computation of damages, a reference shall be made only upon a showing that some exceptional condition requires it.[8]

Heeding the spirit of Rule 53, the federal courts began to use masters only sparingly. *See* Brazil, *supra*, at 343. The United States Supreme Court confirmed this interpretation of Rule 53(b) in *La Buy v. Howes Leather Co.*, 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957). In that case, the district court had consolidated two antitrust actions for trial that the parties anticipated would last six weeks. There were eighty-seven plaintiffs in one case, six in the other, and six defendants in each. Because of the complexity of the cases, the estimated length of trial, and the court's congested docket, the court referred the cases to a master for trial on the merits, over the objection of all parties. On applications for writ of mandamus, the court of appeals directed the district court to vacate its order referring the cases to the master, holding that no "exceptional condition" within the meaning of Rule 53(b) was present. The Supreme Court affirmed. The Court reasoned that a congested court calendar could not be an exceptional condition under the rule, or references to masters would become the rule rather than the exception. Furthermore, the court reasoned, the complexity of issues in a case could not be an exceptional condition, or the very cases which most needed the attention of an experienced trial judge would always be referred to masters. Neither of these factors, nor the estimated length of trial, nor all three together, the Court concluded, constituted an exceptional condition justifying reference to a master. *La Buy*, 352 U.S. at 259, 77 S.Ct. at 315. Without attempting to define what would be an exceptional condition under Rule 53(b), the Court admonished that "[t]he use of masters is 'to aid judges in the performance of specific judicial duties, as they may arise in the

---

**8.** Since Rule 53(b) was promulgated in 1938, the only change in the portion quoted was in 1966, to add the words, "and of difficult computation of damages". *See* 5A J. MOORE & J. LUCAS, MOORE'S FEDERAL PRACTICE ¶ 53.01[1], [3] & [7], at 53–8 to 53–9 (1990).

progress of a cause,' ... and not to displace the court." *La Buy,* 352 U.S. at 256, 77 S.Ct. at 313.

While *La Buy* involved only a reference to a master for trial, the language of Rule 53(b) appears to apply to all references to a master. The scope of a court's authority under Rule 53(b) to refer pretrial matters generally, and discovery matters in particular, has not been clearly defined. One view is that Rule 53(b) allows referrals of discovery or other pretrial matters as long as the strict requirements of the rule are met. *See* 9 C. Wright & A. Miller, *supra,* § 2605, at 790; 5A J. Moore & J. Lucas, *supra* n. 7, ¶ 53.05[2], at 53–59; Kaufman, *supra* n. 3, 465–69. It has been suggested, however, that Rule 53(b) was not intended by its drafters to cover referral of discovery matters at all, and that the authority for such referrals must be found within the court's inherent power. *See* Brazil, *supra,* at 315–64. Some recent cases suggest that if Rule 53(b) does apply to referrals of discovery matters, the requirements of the rule, read strictly in *La Buy,* are relaxed. *See* Silberman, *Judicial Adjuncts Revisited: The Proliferation of Ad Hoc Procedure,* 137 U.Pa.L.Rev. 2131, 2136 n. 31 (1989).

Since *La Buy,* there appears to have been a growing trend among the federal courts to refer pretrial matters. *See id.* at 2135–37. Such referrals now go not only to masters but to magistrates whose powers have been greatly expanded by the Federal Magistrates Act, 28 U.S.C. §§ 631–39. Referrals to federal magistrates avoid some of the problems historically encountered in the use of masters. Although the functions of the two offices are similar, magistrates are salaried judicial employees of the government with an institutional role prescribed by statute, while masters are private persons paid by fees assessed the parties with designated duties in particular cases. These differences are important. A referral to a federal magistrate does not result in any additional direct expense to the parties, and the magistrate has a quasi-judicial role by virtue of the statutes governing the office. *See* Silberman, *supra,* 137 U.Pa.L.Rev. at 2133–37.[9]

III

A

Texas jurisprudence regarding masters in chancery is much more limited than that of England and the federal courts of this country. The use of auditors—specialized masters—in cases involving accounts was authorized by the first Legislature. Act approved May 13, 1846, § 97, 1st Leg., 1846 Tex.Gen.Laws 363, 389–90, 2 H. Gammel, Laws of Texas 1669, 1695–96 (1898),

---

9. The theory underlying the expanded use of referrals to masters and magistrates is that by thus delegating pretrial matters, the judge is free to devote more time to trials and the decision of substantive issues, thus expediting disposition of cases. *See, e.g.,* Kaufman, *supra* n. 3, at 464. Whether this theory is correct—that is, whether removing judges from pretrial proceedings actually expedites disposition of all cases—is a matter of legitimate, continuing debate. *See* Silberman, *supra,* 137 U.Pa.L.Rev. at 2136–37, 2137–78; *cf.* Posner, *Coping with the Caseload: A Comment on Magistrates and Masters,* 137 U.Pa.L. Rev. 2215 (1989). *See also* The Brookings Institution, Justice for All 3, 28 (1989); Higginbotham, *Bureaucracy—the Carcinoma of the Federal Judiciary,* 31 Ala.L.Rev. 261 (1980); Robel, *Caseload and Judging: Judicial Adaptations to Caseload,* 1990 B.Y.U.L.Rev. 3, 15–16, 36; Schwarzer, *Managing Civil Litigation: the Trial Judge's Role,* 61 Judicature 400 (1978). *Compare* Case Management and Court Management in United States District Courts, Fed.Jud. Center, 1977 District Court Study Project 60–62 (S. Flanders ed.); P. Ebener,

Court Efforts To Reduce Pretrial Delay: A National Inventory 34–35 (Rand Institute for Civil Justice 1981) (use of "parajudicials"); Lawyers Conference Task Force on Reduction of Litigation Cost and Delay, A.B.A. Jud.Admin.Div., Defeating Delay: Developing and Implementing a Court Delay Reduction Program 43–44 (1986) (advocating use of judicial adjuncts as a short term solution to a backlog); Hazard & Rice, *Judicial Management of the Pre-trial Process in Process in Massive Litigation: Special Masters as Case Managers,* 1982 Am.B.Found.Res.J. 375 (1982); Kaufman, *The Judicial Crisis: Court Delay and the Parajudge,* 54 Judicature 145, 148 (1970); McGovern, *Toward a Functional Approach for Managing Complex Litigation,* 53 U.Chi.L.Rev. 440 (1986); Moore, *The Use of Masters in Chancery in Texas Courts,* 53 Tex.B.J. 442 (1990); *and* Seron, *Magistrates and the Work of the Federal Courts: A New Division of Labor,* 69 Judicature 353 (1986). We do not attempt to resolve this issue but note only that the effectiveness of masters and magistrates in pretrial proceedings cannot be taken simply as a given.

formerly Tex.Rev.Civ.Stat.Ann. art. 2292 (repealed by Texas Rules of Civil Procedure).[10] The first statute authorizing appointment of masters with broader powers was enacted in 1887 and required that a master be appointed in every receivership case. Act approved Apr. 2, 1887, 20th Leg., R.S., ch. 131, § 10, 1887 Tex.Gen. Laws 119, 121, 9 H. GAMMEL, LAWS OF TEXAS 917, 919 (1898), formerly Tex.Rev.Civ. Stat.Ann. art. 2320 (repealed by Texas Rules of Civil Procedure).[11] This latter statute did not, however, prohibit appointments of masters in other cases. *San Benito Cameron County Drainage Dist. v. Farmers' State Guaranty Bank,* 192 S.W. 1145, 1146 (Tex.Civ.App.—San Antonio 1917, writ ref'd). In fact, masters were used in other contexts. *See e.g. Trigg v. Trigg,* 18 S.W. 313 (Tex.1891) (investigation of property claims of spouses in a divorce action referred to a master). Thus, in Texas as in other American jurisdictions, the authority to appoint masters in chancery appears to have been based in part at least upon the inherent power of the court. *See also Mays v. Fifth Court of Appeals,* 755 S.W.2d 78, 80–81 (Tex.1988 Spears, J., concurring).

In 1941, the statutes authorizing masters and auditors were repealed by the adoption of Rules 171 and 172, respectively, of the Texas Rules of Civil Procedure. Rule 171 was patterned after Rule 53(b) of the Federal Rules of Civil Procedure, adopted three years earlier, and has never been substantively amended. It states in pertinent part:

> The court may, in exceptional cases, for good cause appoint a master in chancery, who shall ... have such power as the master of chancery has in a court of equity.

Rule 171 shares not only much of the language of federal rule 53 but its purpose as well: it permits masters to be used but only in limited circumstances so as to avoid the abuses that centuries of experience have proven accompany a broader, systematic use. Rule 172 requires appointment of an auditor only when "an investigation of accounts or examination of vouchers appears necessary for the purpose of justice between the parties".

Rule 171 both confers and circumscribes power to appoint masters. Although the federal courts have not resolved whether they retain inherent power to appoint masters apart from Rule 53, we hold that Rule 171 is the exclusive authority for appointment of masters in our state courts. Were it otherwise, the important purposes for the restrictions imposed by the rule on the power to appoint masters would be thwarted. Centuries of experience counsel against the use of masters except in limited circumstances. We therefore conclude that every referral to a master, unless authorized by statute or consented to by the parties, must comply with Rule 171.[12]

**10.** "[W]henever, in any suit, it shall appear to the court that an investigation of accounts, or examination of vouchers is necessary, for the purposes of justice between the parties, the court shall appoint an auditor or auditors to state the accounts between the parties, and to make report thereof to the court, as soon as may be, and the report so made shall, under the direction of the court, be given in evidence to the jury, subject, however, to be impeached by evidence from either party, and the court shall award reasonable compensation to such auditors, which shall be allowed and taxed in the bill of costs, to be recovered by the successful party, as in other cases."

**11.** "The court shall, in every case of the appointment of receiver, also after his qualifying, appoint a master in chancery, who shall be a citizen of this State, and not an attorney for either party to the action, nor related to either party, who shall perform all of the duties required of him by the court, and shall be under orders of the court, and have such power as a master of chancery has in a court of equity."

**12.** Among the matters that may be assigned to masters and magistrates created by statute are the following: family law matters, TEX.GOV'T CODE §§ 54.001–.018; criminal matters in certain counties, *id.* §§ 54.201–.206 (Jefferson County), §§ 54.301–.313 (Dallas County), §§ 54.-651–.663 (Tarrant County), §§ 54.731–.763 (El Paso County), §§ 54.871–.884 (Lubbock County), §§ 54.901–.913 (Bexar County); juvenile matters in certain counties, *id.* §§ 54.401–.414 (Wichita County), §§ 54.681–.700 (Harris County), §§ 54.921–.939 (Bexar County); civil and tax matters in Dallas County, *id.* §§ 54.301–.313; and various other matters, TEX.ALCO.BEV.CODE § 61.31 (license applications in certain counties), TEX.FAM.CODE §§ 14.82–.85 (IV–D cases), TEX.HEALTH & SAFETY CODE §§ 81.165–.168 (deten-

## B

We now consider whether the appointment of a master in this case was authorized by Rule 171 of the Texas Rules of Civil Procedure.[13] The appointment of a master lies within the sound discretion of the trial court and should not be reversed except for a clear abuse of that discretion. *Texas Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 510 (Tex.1980); *Mann v. Mann*, 607 S.W.2d 243, 246 (Tex.1980).

We note at the outset that this is not a case in which the appointment was by consent of the parties. It has long been recognized that a reference premised on the consent of the parties is not subject to the same strictures as one imposed by the court. *See Kimberly v. Arms*, 129 U.S. 512, 9 S.Ct. 355, 32 L.Ed. 764 (1889); *Heckers v. Fowler*, 69 U.S. (2 Wall.) 123, 17 L.Ed. 759 (1864). To the extent the parties consent to the reference it will ordinarily not be subject to challenge. *See Minchen v. First Nat'l Bank of Alpine*, 263 S.W.2d 601, 604 (Tex.Civ.App.—El Paso 1953, writ ref'd n.r.e.). In this case, however, most of the parties objected to the appointment of a master. The issue, then, is the authority of the trial court to compel the parties to submit matters to a master.

Rule 171 permits appointment of a master only "in exceptional cases, for good cause". Because the source of this requirement was federal Rule 53, we analogize it to the "exceptional condition" standard of federal Rule 53(b) construed in *La Buy*. We agree with *La Buy* that this requirement cannot be met merely by showing that a case is complicated or time-consuming, or that the court is busy. This does not mean that the complexity of a case and the demands upon the court's time cannot be considered in deciding whether to refer a matter to a master. But it simply does not and cannot follow from the fact that our trial courts are busy—as they certainly are—that they do not have time to hear complex cases. Rather, as *La Buy* observed, these are the very cases which most need and benefit from the supervision of an experienced trial judge.

The "exceptional cases/good cause" criterion of Rule 171 is not susceptible of precise definition. As hard as it is to determine whether the appointment of a master meets the standard in a given case, it is virtually impossible to make that determination for future cases. As federal Rule 53(b) states, reference to a master is not the rule in most cases. The criterion of Rule 171 necessitates a valid explanation for deviating from this rule.

In this case, the trial court found good cause to appoint a master "[b]ecause of the complex nature of the case and the numerous pre-trial issues to be disposed of". The record reflects that this is a toxic tort case involving one plaintiff and eighteen defendants. The gist of plaintiff's allegations is that chemicals in defendants' products caused her husband to contract lung cancer from which he died. In the first ten months the case was pending eight discovery motions were filed. The record does not reflect that any of these motions was especially complex; indeed, it does not appear that the trial court heard the merits of any of the pending discovery disputes before appointing a master. While the case is undoubtedly more complicated than many other cases on the trial court's docket, it can hardly be said to be exceptional, at least at this point in its development. We know from our vantage point that such cases are not uncommon among the trial courts of this state.

Even if this were an exceptional case, based upon the allegations in the

tion of persons with communicable diseases), §§ 463.017–.018 (protective custody of drug-dependent persons). See also Tex.Civ.Prac. & Rem. Code §§ 151.001–.013 (trial by special judge on agreement of the parties), §§ 152.001–.004 (county alternative dispute resolution systems), §§ 154.001–.073 (alternative dispute resolution procedures), and §§ 155.001–.006 (settlement weeks).

13. The trial court specifically did not rely upon the power of district courts in Dallas County giving preference to civil matters to refer matters to a master under sections 54.501–.514 of the Government Code, and we do not consider those provisions.

pleadings, the number of parties, or the amount of activity it generated, we would be reluctant to approve the trial court's delegation of the supervision of *all* discovery to be conducted in the case to the master. This blanket reference is much more difficult to justify than the reference of a single issue. Indeed, it would be a truly exceptional case which warranted referral of all discovery matters to a master. Assuming that problems have already arisen in discovery in this case to warrant reference to a master, although the record does not support this assumption, there is nothing in this record to reflect that the future conduct of discovery will justify supervision by a master rather than the court. Absent such a showing, the parties have simply been ordered to pay by the hour for resolution of the same kinds of issues by a master that litigants in other cases can obtain from the court without such expense. The trial court's order asserts that the benefit to the parties of a master in this case will exceed his rather substantial expense, but it does not explain why the parties should not obtain the same benefit from the court without any expense at all.[14]

We are not unmindful of the heavy burdens upon the limited time and resources of our trial courts, nor are we unsympathetic. Under Rule 171, however, masters cannot be appointed except "in exceptional cases, for good cause". The record before us shows that this case is not exceptional, and that there is not good cause to refer all discovery matters to a master.

\* \* \* \* \* \*

■ The trial court's appointment of a master in this case was a clear abuse of discretion. To require the parties to reserve their complaint for appeal would be to deny them any effective relief from the trial court's order. They are therefore entitled to relief by mandamus. *See La Buy*, 352 U.S. at 254–55, 77 S.Ct. at 312–13. Accordingly, we direct respondent to vacate the order appointing a master in Cause

No. 88–16085–M. We are confident that respondent will comply promptly. Our writ will issue only if he does not.

MAUZY, J., concurs in result with an opinion.

MAUZY, Justice, concurring.

I concur in the majority's result. Under the facts of this case, the trial court's appointment of a special master was a clear abuse of discretion. *See La Buy v. Howes Leather Co.*, 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957).

I object, however, to the majority's unnecessary discourse on the historical role of special masters. This Court's role is not to author legal treatises. *Cf. Reagan v. Vaughn*, 804 S.W.2d 463 (Tex.1991) (Hecht, J., dissenting on motion for rehearing). Nor is it to issue advisory opinions. *Cf. Edgewood v. Kirby*, 804 S.W.2d 491 (Tex. 1991) (on motion for rehearing). The people of this state elect their judges to decide the cases that come before the courts. As surely as that role is served by sound reasoning, so is it disserved by needless exercises in pedantry.

---

**14.** The parties argue that the trial court exceeded his authority in ordering them to pay the master's fees in advance or at any time prior to the final award of costs in the judgment. In view of our disposition of the case, we do not address this argument.