In re Charles XELLER, M.D. and
Medical Evaluation Specialists,
Inc ., Relators.

In re Highlands Casualty Insurance
Company, Relator.

Nos. 14–98–01190–CV, 14–98–01211–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Sept. 16, 1999.

Teresa I. Ford, The Woodlands, for appellants in No. 14–98–01190–CV.

Robert Shults, Michael Kerensky, Houston, for appellees in No. 14–98–01190–CV.

Michael Quinn, James P. Wallace, Austin, Robert A. Shults, Houston, for appellants in No. 14–98–01211–CV.

Michael Kerensky, Houston, Teresa I. Ford, The Woodlands, Christian Hill, Houston, for appellees in No. 14–98–01211–CV.

Panel consists of Justices MAURICE E. AMIDEI, EDELMAN and SEARS.*

## OPINION

MAURICE E. AMIDEI, Justice.

This consolidated mandamus proceeding involves a discovery dispute arising out of a workers' compensation lawsuit. Relators, Charles Xeller, M.D., Medical Evaluation Specialists, Inc. ("MES") and Highlands Casualty Company ("Highlands") complain about the appointment of a master and various aspects of the court's dis-

covery order.[1] We conclude that relators' complaint about the master is barred by laches, but that the court's discovery order of September 15, 1998, exceeds the scope of proper discovery. Therefore, we conditionally grant mandamus relief in part.

### Locke's Workers' Compensation Claim

On April 7, 1992, Richard Locke, the real party in interest, was injured on the job while working for Brown & Root. Highlands is Brown & Root's workers' compensation carrier. Locke's treating physician, Dr. Walter Sassard, diagnosed Locke with a "cervical sprain with probable left cervical radiculopathy." Dr. Sassard also found that Locke had bulging disks at several levels of his cervical spine and possible disk herniation at C3–4, along with spondylosis and degenerative disk disease. On May 17, 1993, Dr. Sassard concluded that Locke had reached maximum medical improvement with a 19% impairment rating. Highlands disputed Dr. Sassard's findings.

Pursuant to statute, the Texas Workers' Compensation Commission ("the Commission") selected Dr. Xeller as the "designated doctor" to examine Locke. *See* TEX. LAB.CODE ANN. §§ 408.122, 408.125 (Vernon 1996).[2] On October 23, 1993, Dr. Xeller examined Locke at the facilities of MES, which provides administrative support services for physicians. In November 1993, Dr. Xeller wrote reports disputing Dr. Sassard's findings. Finding a lack of ob-

---

* Senior Justice Ross A. Sears sitting by assignment.

1. We refer to relators separately where appropriate.

2. If a dispute exists as to a claimant's impairment rating or as to whether a workers' compensation claimant has reached maximum medical improvement, the Commission must direct the claimant to be examined by a designated doctor chosen by mutual agreement of the parties. *See* TEX.LAB.CODE ANN. §§ 408.122(c), 408.125(a). If the parties cannot agree on a designated doctor, the Commission must choose the doctor, who must

make a written report to the Commission. *See id.* §§ 408.122(c), 408.125(b), (c). If the designated doctor is chosen by the parties, then the Commission must adopt the impairment rating given by the doctor. *See id.* at § 408.125(d). If the designated doctor is chosen by the Commission, the doctor's determination of maximum medical improvement or impairment rating is given presumptive weight and the Commission must adopt that rating unless the great weight of other medical evidence is to the contrary. *See id.* at §§ 408.122(c), 408.125(e). Only the claimant or an appropriate member of the Commission can communicate with the designated doctor about the case. *See id.* at § 408.125(f).

jective clinical findings to support Dr. Sassard's conclusions, Dr. Xeller concluded that Locke had reached maximum medical improvement with a 0% impairment rating. Locke contested Dr. Xeller's opinion through the Commission, which ultimately found for Locke and reinstated the 19% impairment rating. *See generally* TEX.LAB. CODE ANN. Ch. 410 (Vernon 1996).

## Highland's Appeal To The District Court

On March 28, 1995, Highlands appealed the Commission's decision to the 189th District Court of Harris County. *See id.* at. § 410.202. Locke filed a counterclaim against Highlands and a third-party claim against MES and Dr. Xeller, alleging these parties "perpetrated a fraud and engaged in a civil conspiracy" to deprive him of workers' compensation benefits. Locke also alleged intentional infliction of emotional distress and breach of a duty of good faith and fair dealing. Highlands dismissed its appeal and paid benefits to Locke. Locke's counterclaim and third-party action are still pending.

In August 1995, Locke served Highlands with a "first set of written discovery" seeking, for specified periods: (1) checks from Highlands to MES, Dr. Xeller and other MES physicians; (2) medical reports known as "TWCC–69 Forms"[3] prepared by Dr. Xeller and other MES physicians in connection with "required medical examinations"[4] of Brown & Root employees; (3) contracts between Highlands and MES; and (4) correspondence between Highlands, Dr. Xeller and/or MES.[5] Locke also asked Highlands to admit or deny that it "retained" MES, Dr. Xeller and other MES physicians to perform required medical examinations on Brown & Root employees for the specified period.[6] Locke further requested Highlands to state, for specified periods: (1) the total amount of money it paid to Dr. Xeller and MES; and (2) the total number of required medical examinations that Dr. Xeller and other MES physicians performed on Brown & Root employees.[7] Highlands objected to these discovery requests on grounds of privilege, relevance, and undue burden.

In October 1996, Locke served Highlands with a second request for production seeking, for specified periods: (1) checks from Highlands to MES and all of Locke's health care providers arising from injury; (2) checks from Highlands to Dr. Xeller while acting as a designated doctor for Locke; (3) correspondence between Highlands and MES or Dr. Xeller pertaining to this lawsuit; (4) checks from Highlands to Dr. Sassard for his examination of Locke; and (5) correspondence concerning Locke between Highlands and MES or any other person working for or with MES.[8] High-

---

3. This Commission generated form entitled, "Report of Medical Evaluation," is a medical record signed and filled out by the doctor. It asks for a diagnosis and narrative history of the employee's medical condition, inquires whether the employee has reached maximum medical improvement, and requests objective findings.

4. The Commission may a require an employee to submit to a medical examination to resolve any question about: (1) the appropriateness of the health care received by the employee; (2) the impairment caused by the compensable injury; (3) the attainment of maximum medical improvement; or (4) similar issues. TEX.LAB.CODE ANN. § 408.004(a) (Vernon 1996). The Commission may require an employee to submit to a medical examination at the re-

quest of the insurance carrier, but only after the insurance carrier has attempted and failed to receive the permission and concurrence of the employee for an examination. *Id.* at § 408.004(b). The examination is conducted by a doctor *selected by the insurance carrier*, but the injured employee is entitled to have his doctor present. *See id* at § 408.004(d), (e) (emphasis added).

5. Requests for Production one through five, seven, sixteen, and seventeen.

6. Requests for Admissions five through eight.

7. Interrogatories ten through seventeen.

8. Requests one, three, four, seven, eight, nine, and twelve.

lands again objected on grounds of privilege, undue burden and overbreadth.

Later that fall, Locke filed motions to compel relators to respond to his first set of discovery requests. Highlands responded that Locke's discovery requests were not reasonably calculated to lead to the discovery of admissible evidence and moved for a protective order and alternatively, for an extension of time to respond. By the end of November 1996, the parties had deposed numerous other claimants designated by Locke. Locke claimed these depositions and accompanying medical records show a pattern by MES physicians of assigning low impairment ratings to claimants. Highlands responded to this discovery by asserting there was no evidence of conspiracy, fraud, or bad faith.

In December 1996, Locke served relators with a supplemental request for production. Locke sought from January 1991, to the present: (1) all medical reports and corresponding TWCC–69 forms generated by all physicians at an MES facility in connection with required medical examinations or designated doctor examinations; and (2) all related payments by any workers' compensation carrier to any party or to MES. On the same date, Locke filed a supplemental motion to compel and a motion for a discovery plan order in response to relators' prior discovery objections. Relators objected to the supplemental requests on grounds of privilege, relevance, and undue burden. Relators also moved for a protective order.

### The Court's Appointment Of A Master

Prior to filing his supplemental request for production, Locke filed a "joint" motion to appoint a master under Texas Rule of Civil Procedure 171 On January 3, 1997, relators opposed Locke's motion asserting there was no agreement by the parties for such an appointment. On May 13, 1997, after acknowledging that Locke's requests encompassed thousands of claims and volumes of documents, the trial court appointed a master to oversee all discovery issues.

On October 28, 1997, the master held a hearing on Locke's motions to compel and took matters under advisement. At this hearing, Locke presented discovery that had occurred to date. In particular, Locke offered the depositions and medical records of twenty current or former claimants and clients of one of Locke's lawyers, Christian Hill. Locke also offered the deposition of Bernardo Eureste, an attorney who had represented over 2500 workers' compensation claimants. Attached as exhibits to Eureste's deposition were the redacted TWCC–69 Forms of eighty unidentified claimants and the affidavits, TWCC–69 Forms and medical reports of twenty identified claimants. Locke further offered: (1) the affidavit and medical records of still other claimants; (2) the depositions of Locke's physician, Dr. Sassard, and Franz Klein, a chiropractor who had attended thirty-five to forty required medical examinations performed by MES physicians; and (3) charts and computer data showing how MES allegedly subverted the workers' compensation system.

Locke argues this discovery shows a conspiracy among relators to "low ball" workers' compensation claimants. According to Locke, Highlands "refers" claimants to MES physicians, who do not follow the AMA guidelines required by statute and regularly assign give low impairment ratings to claimants. *See* TEX.LAB.CODE ANN. § 408 .124.

On July 21, 1998, the master issued recommendations that essentially called for Highlands to respond to all unanswered discovery. As to the production of documents, however, the master recommended that the parties first enter into a comprehensive confidentiality agreement to protect the public dissemination of sensitive and confidential information contained in the documents.[9] In addition, the master

---

9. In her recommendations, the master noted that Locke had outlined a method for the exchange of information without the disclosure of confidential information. However, it

recommended that Highlands not be required to produce correspondence between it and Dr. Xeller, and between it and MES, pertaining to the underlying suit from January 1, 1995, to the present. Finally, the master recommended that Locke pay a portion of the "reasonable costs incurred by the Defendants in compiling the discoverable documents" as determined by the court.

After a hearing held on September 15, 1998, the master modified her recommendations by narrowing the relevant discovery period for the production of documents to between January 1, 1993, when MES started its business, and October 31, 1995, two years after Dr. Xeller's examination of Locke. That same day, the trial court signed an order adopting all of the master's recommendations. The court, however, placed a ninety-day time limit on the confidentiality agreement and ordered that documents were not to be produced "before the signing of the confidentiality order."

On October 15, 1998, Dr. Xeller and MES filed a petition for writ of mandamus complaining of the appointment of the master and the court's discovery order. Six days later, Highlands filed a petition for writ of mandamus raising similar complaints.[10] On January 7, 1999, we consolidated the two proceedings. Two weeks later, we abated the proceedings to allow the newly elected judge of the 189th District Court to reconsider the September 15, 1998, discovery order. On April 29, 1999, after we granted an extension of the abatement period, the trial court declined to reconsider the discovery order.

## Mandamus

 Mandamus relief is available if the trial court violates a duty imposed by law or clearly abuses its discretion either in resolving factual issues or in determining legal issues, when there is no adequate remedy at law. *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex.1992). A trial court abuses its discretion by making an arbitrary and unreasonable decision that amounts to clear and prejudicial error at law. *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex.1985).

 With respect to the resolution of factual issues or matters committed to the trial court's discretion, the reviewing court may not substitute its judgment for that of the trial court. *See Walker*, 827 S.W.2d at 839. In other words, even if the reviewing court would have decided the issue differently, it cannot disturb the trial court's decision unless it is shown to be arbitrary and unreasonable. *See id.* at 840. Thus, when asserting the trial court clearly abused its discretion in resolving factual issues or matters committed to its discretion, the relator must establish that the trial court could reasonably have reached only one decision. *See id.* at 840. In the instant proceeding, relators are faced with this burden because the appointment of a master and the scope of discovery are both matters committed to the trial court's discretion. *See In re American Optical Corp.*, 988 S.W.2d 711, 712–14 (Tex.1998) (per curiam); *see Simpson v. Canales*, 806 S.W.2d 802, 811 (Tex.1991).

## The Appointment Of A Master

 Relators first argue that the trial court abused its discretion in appointing a

---

is not clear whether the master recommended adoption of Locke's discovery plan. Setting a timetable for each step, this plan basically called for the master to initially compile a thousand-file data base that included: (1) the claim number; (2) date of exam; (3) date of maximum medical improvement; (4) impairment rating; (5) date of injury, and (6) name of the examining physician. From this data

base, the master was to determine whether further discovery was necessary.

10. While all of the relators complain about the supplemental request for production, Highlands also complains about the prior requests for production, interrogatories and request for admissions, which were directed solely to Highlands.

master under Texas Rule of Civil Procedure 171, which permits the appointment of a master only "in exceptional cases for good cause." *See Simpson,* 806 S.W.2d at 812. While the appointment of a master under Rule 171 is reviewable by mandamus, *see id.,* Locke contends that we should deny mandamus relief on this issue under the equitable doctrine of laches. *See Rivercenter Associates v. Rivera,* 858 S.W.2d 366 (Tex.1993). Locke asserts that relators waited too long to complain about the appointment of a master. We agree.

■■■ Mandamus is an extraordinary remedy, not issued as a matter of right, but at the discretion of the court. *See id.* Although mandamus is not an equitable remedy, its issuance is largely controlled by equitable principles. *See id.* One such principle is that "[e]quity aids the diligent and not those who slumber on their rights." *See id.* (quoting *Callahan v. Giles,* 137 Tex. 571, 576, 155 S.W.2d 793, 795 (1941)). Here, the master was appointed in May 1997, held a discovery hearing in October 1997, and made her recommendations in July 1998. After another discovery hearing, the master modified her recommendations in September 1998. At that time, the trial court adopted the master's recommendations. Relators then waited another month before seeking mandamus relief.

Relators point out that the sixteen month delay between the master's appointment and the adoption of her recommendations was not their fault. While this may be true, relators' complaint about the appointment of a master is not based on the master's recommendations, but on grounds that this is not the proper type of case for a master under Rule 171. Thus, contrary to relators' contention, mandamus relief would not have been premature if sought at the time of the appointment of the master. Relators explain they delayed

seeking mandamus relief until after the trial court adopted the master's recommendations for the sake of judicial economy so that all discovery issues could be reviewed at the same time. In our view, however, judicial economy would have been better served if relators' had sought mandamus relief immediately after the appointment of the master. If relators had done so, they might not be complaining about the present discovery rulings by a master who they now claim should not have heard those matters in the first place.

■■■ Delay alone provides ample ground to deny mandamus relief. *See Rivercenter,* 858 S.W.2d at 367–68 (relator waited four months to seek mandamus relief from demand for jury trial); *see also International Awards, Inc. v. Medina,* 900 S.W.2d 934, 935–36 (Tex.App.—Amarillo, 1995 orig. proceeding) (relator sought mandamus relief on the day documents were due and four months after the court's oral discovery ruling); *Furr's Supermarkets, Inc. v. Mulanax,* 897 S.W.2d 442 (Tex.App.—El Paso, 1995, orig. proceeding) (relator sought mandamus relief from severance order four months after severance and six days before trial on severed claim); *Bailey v. Baker,* 696 S.W.2d 255 (Tex.App.—Houston [14th Dist.] 1985 orig. proceeding) (relator sought mandamus relief from discovery order four months after order and two weeks before trial). Because relators waited sixteen months to seek mandamus relief from the appointment of a master, we hold that mandamus relief on that basis is barred by laches.[11]

### Privilege and Overbreadth

Relators next contend that Locke's discovery requests invade the physician-patient privilege, and are irrelevant and overbroad. Relators argue that the medical reports and corresponding TWCC–69 Forms generated by Dr. Xeller and any

---

**11.** Relators contend that laches does not bar their complaint because the court's authority to appoint a master is a jurisdictional question. Relators have cited no authority nor have we found any that holds that the appointment of a master under Rule 171 is jurisdictional.

other physician at MES in connection with required medical examinations or designated doctor examinations of Brown & Root employees or any other claimants are privileged. We agree.

Texas Rule of Evidence 509 states that "confidential communication between a physician and a patient, relative to or in connection with any professional services rendered by a physician to the patient are privileged and may not be disclosed." Tex.R.Evid. 509(c)(1). Section 5.08(a) of the Medical Practice Act also provides, with certain exceptions, that "communications between one licensed to practice medicine, relative to or in connection with any professional services as a physician to a patient, is confidential and privileged...." Tex.Rev.Civ.Stat.Ann. Art. 4495b § 5.08(a), (g), (h) (Vernon Pamph. 1999). (repealed by Act of September 1, 1999, 76th Leg., R.S., Ch. 388, §6 (a), 1999 Tex. Gen. Laws 1431, 2439-40) (now codified without substantive change at Tex. Occupations Code §151.001 et seq. (Vernon Supp. 2000)) "Any person who receives information from confidential communications or records ... who are acting on the patient's behalf may not disclose the information except to the extent that disclosure is consistent with the authorized purposes for which the information was obtained." *See id.* at § 5.08(c). The privilege protects "records of the identity, diagnosis, evaluation or treatment of a patient by a physician that are created or maintained by a physician." *See* Tex.R.Evid. 509(c)(2); *see also* Art. 4495b § 5.08(a). Furthermore, apart from any statutory privilege, the medical records of an individual have also been held to be within zone of privacy protected by the United States Constitution. *See Alpha Life Ins. Co. v. Gayle,* 796 S.W.2d 834, 836 (Tex.App.—Houston [14th Dist.] 1990, no writ); *see also* Op.Tex. Att'y Gen. No. JM–370 (medical records not protected by statute may be protected by a constitutional right to privacy).

▮▮▮ Locke does not contest relators' claim of privilege under the Medical Prac-

tice Act or under the constitutional right to privacy. Instead, Locke claims only that the medical reports in question are discoverable under the "litigation exception" to the physician-patient privilege. *See* Tex.R.Evid. 509(e)(4); *see also R.K. v. Ramirez,* 887 S.W.2d 836, 843 (Tex.1994). Because Locke does not dispute that the medical reports and corresponding TWCC–69 Forms are privileged under the Medical Practice Act and the right to privacy, we hold that the documents are not discoverable and thus, we need not decide whether the litigation exception applies. Here, Locke seeks medical reports relating to thousands of non-party claimants without their consent. He argues that the physician-patient privilege and right to privacy do not preclude him from obtaining redacted TWCC–69 Forms like the ones he offered below. However, "merely because a person ... has filed a claim with an insurance company does not necessarily mean the person ... has consented to making his medical records public." *See In re Dolezal,* 970 S.W.2d 650, 652–53 (Tex.App.—Corpus Christi, 1998, orig. proceeding) (holding that trial court abused its discretion in ordering chiropractor to disclose the identity of all patients that had any type of connection to the plaintiff's attorneys and to produce all billing records for services rendered to attorneys or patients).[12] Likewise, to the extent that other documents, such as checks, bills or correspondence require disclosure of the identity, diagnosis and treatment of non-party workers' compensation claimants without their consent, they are also privileged.

▮▮▮ Locke argues the court's confidentiality order will overcome any privilege. We disagree. As the parties acknowledge, the court has yet to enter a confidentiality order. Even if there was a confidentiality order that prevented the

---

**12.** Locke asserts that *Dolezal* is inapplicable because he does not seek documents for impeachment purposes. Not all the discovery requests in *Dolezal* dealt with the impeachment issue. The impeachment issue there

dealt only with the defendants request for the identity of attorneys who referred patients to, or otherwise worked with, the chiropractor. *See* 970 S.W.2d at 653–54.

dissemination of protected information to the public, such an order does not alone justify disclosure. *See e.g., Ex parte Lowe,* 887 S.W.2d 1, 4 (1994). This is especially true here because relators are subject to possible civil and criminal liability if they release confidential information about thousands of non-party claimants.[13] More importantly, a confidentiality order does not overcome a claim of privilege.

■■■■■■ Highlands argues that Locke's remaining discovery requests are overbroad and irrelevant because they seek information related to non-parties in an attempt to uncover evidence of a conspiracy and bad faith.[14] The Texas Supreme Court has repeatedly held that a discovery order that compels overly broad discovery "well outside the bounds of proper discovery" is an abuse of discretion for which mandamus is the proper remedy. *See American Optical Corp.,* 988 S.W.2d 711, 713 (Tex. 1998); *K Mart Corp. v. Sanderson,* 937 S.W.2d 429, 431–32 (Tex.1996); *Dillard Dept. Stores v. Hall,* 909 S.W.2d 491, 492 (Tex.1995); *Texaco., Inc. v. Sanderson,* 898 S.W.2d 813, 814–15 (Tex.1995) (per curiam); *Loftin v. Martin,* 776 S.W.2d 145, 148 (Tex.1989); *General Motors Corp. v. Lawrence,* 651 S.W.2d 732, 733–34 (Tex.1983). While recognizing that trial courts are vested with discretion over the course of discovery, the court has emphasized that discovery may not be used as a "fishing expedition". *See American Optical,* 988 S.W.2d 711, 713. at 1147–48. Discovery requests must be limited by time, place and subject matter. *See Texaco,* 898 S.W.2d at 815. In other words, requests must be reasonably tailored to include only matters relevant to the case. *See American Optical,* 988 S.W.2d 711, at 713.

■■■ Here, Locke alleges that relators conspired to defraud him of workers' compensation benefits by sanctioning fraudulent medical examinations. While not asserting a class action, Locke seeks information about Highlands' relationship with MES, Dr. Xeller and other MES physicians, without regard to whether aspects of that relationship pertain to Locke's particular workers' compensation claim or whether those documents are reasonably calculated to lead to any evidence of a conspiracy. Locke's discovery requests seek documents like contracts, checks and correspondence as well as information about "retainers," money paid, and the number of required medical examinations. These requests are not only vague, but also to the extent they attempt to "fish" through relators' files for information pertaining to non-party claimants and their insurance carriers and physicians, we conclude they are overbroad.[15]

■■■■ We recognize that a reasonably tailored discovery request is not over-

---

13. A person aggrieved by a violation of this section relating to the unauthorized release of confidential and privileged information may prove a cause of action for civil damages. *See* TEX.REV.CIV .STAT.ANN. Art. 4495b, § 5.08(*1*). With certain exceptions "information in or derived from a claim file" is confidential and cannot be disclosed by the Commission or by any person to whom claim information is released. *See* TEX.LAB.CODE ANN. §§ 402.083, 402.086. It is an offense for a person to knowingly, intentionally or recklessly publish disclose or distribute confidential claim information to a person who is not authorized to receive such information from the Commission. *See id.* § 402.091. We note that Locke's Open Records Request for TWCC–69 Forms and medical reports was denied by the Commission.

14. A "civil conspiracy" is "a combination by one or more persons to accomplish an unlawful purpose or accomplish a lawful purpose by unlawful means." *See Firestone Steel Products Co. v. Barajas,* 927 S.W.2d 608, 614 (Tex.1996); *see also Triplex Communications, Inc. v. Riley,* 900 S.W.2d 716, 719 (Tex.1995). An insurer breaches its duty of good faith and fair dealing when it denies or delays payment of a claim after its liability has become reasonably clear. *See State Farm Fire & Cas. Co. v. Simmons,* 963 S.W.2d 42, 44 (Tex.1998); *see also Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 56 (Tex.1997).

15. Contrary to relators' contention, the trial court placed reasonable limitations on time period by narrowing the relevant discovery period to January 1, 1993, when MES opened for business, until October 23, 1995, two years after Dr. Xeller examined Locke.

broad merely because it may include some information of doubtful relevance and that parties have some latitude in fashioning proper discovery requests. *See id.* However, this case is not unlike *Dillard Dept. Stores v. Hall.* There, the plaintiff sued Dillard for false arrest. *See* 909 S.W.2d at 491. At the plaintiff's request, the trial court ordered Dillard to produce "every claims file and incident report prepared from 1985 through 1990 in every lawsuit or claim that involved allegations of false arrest, civil rights violations and excessive use of force" for each of its 227 stores located in twenty states. *See id.* at 492. In response to Dillard's petition for writ of mandamus, the plaintiff admitted he wanted the document production to explore whether he could in good faith allege racial discrimination. *See id.* The Supreme Court rejected the plaintiff's attempt to use discovery to turn a simple false arrest case into a case of racial discrimination, noting that requests for document production may not be used simply to explore. *See id.* The court has since held that no discovery device can be used to "fish." *See K Mart,* 937 S.W.2d at 431. We likewise reject Locke's attempt to use the discovery process to fish for additional claims.

Because we conclude the complained of discovery in the court's order of September 15, 1998, exceeds the proper scope of discovery, we need not address Highlands' complaints regarding the propriety of the "confidentiality" and "cost" provisions of that order. Accordingly, we deny relators' petition for writ of mandamus with respect to the appointment of the master. We conditionally grant relators' petition for writ of mandamus with respect to the complained of discovery in the court's order of September 15, 1998. We are confident the trial court will vacate its order of that date. The writ will issue if the court fails to comply.