

## NUMBER 13-19-00466-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI – EDINBURG

**IN RE BILFINGER WESTCON, INC.**

**On Petition for Writ of Mandamus.**

## MEMORANDUM OPINION

**Before Justices Benavides, Longoria, and Perkes**
**Memorandum Opinion by Justice Longoria[1]**

Relator Bilfinger Westcon, Inc. filed a petition for writ of mandamus in the above cause on September 25, 2019. In sum, relator contends that the trial court abused its discretion by ordering relator to respond to overbroad and irrelevant discovery requests

---

[1] *See* Tᴇx. R. Aᴘᴘ. P. 52.8(d) ("When granting relief, the court must hand down an opinion as in any other case," but when "denying relief, the court may hand down an opinion but is not required to do so."); *see also id.* R. 47.4 (distinguishing opinions and memorandum opinions).

and to prepare an "inventory" in response to requests for production.[2]  We conditionally grant the petition for writ of mandamus in part and deny it in part as discussed herein.

## I. BACKGROUND

Relator, an industrial construction contractor, served as one of several prime contractors for the construction of a hot briquette iron facility in Portland, Texas.  Relator entered into two contracts to work on the project: the M11 Contract and the M12 Contract.  The owner of the project, voestalpine Texas, LLC (voest), ultimately terminated relator from working on the project.  After relator's termination, voest instituted an arbitration proceeding against relator for breach of the M11 Contract, which principally involved fabricating and installing small and medium bore mechanical piping in parts of the project.  Relator counterclaimed against voest for its unpaid contract balance.  The arbitration proceedings, which were extensive and lengthy, resulted in the rendition of a $28,600,000 award in favor of relator and a take-nothing judgment for voest.

Relator thereafter sued Heavy Equipment Movers & Installation, LLC (HEMI), Kevin Maxwell, Advantage Industrial Systems, LLC (AIS), and CMPM Management/Consulting Firm LLC (CMPM) for claims arising from its termination on the M11 contract.[3]  Relator alleged, generally, that these defendants sabotaged relator's work on the project and conspired to have relator terminated from the project so that they could take over the profitable M11 Contract.  Relator alleged, for instance, that HEMI was paid approximately $47,000,000 by voest as a result of relator's termination.  Relator brought

---

[2] This original proceeding arises from trial court cause number 2016DCV-6155-H in the 347th District Court of Nueces County, Texas.  The discovery and pretrial master in this cause is the Honorable Jose Manuel Bañales, and the respondent is the Honorable Missy Medary.  *See* TEX. R. APP. P. 52.2.

[3] According to argument presented below, HEMI and AIS are affiliated companies and are owned by the same entities.

2

causes of action against these defendants for tortious interference with an existing contract, civil conspiracy, business disparagement, unjust enrichment, and fraud by nondisclosure.

The parties engaged in discovery, and the discovery proceedings soon turned contentious. The trial court appointed a discovery and pretrial master "to resolve all discovery and non-dispositive issues and motions filed in this cause" and to submit recommendations for the disposition of such matters to the trial court. AIS and HEMI sought, and relator produced, documents pertaining to relator's performance of the M11 Contract and the arbitration proceedings. Relator produced approximately 200,000 documents in PDF format and produced one data file, asserting that it was producing those documents "as kept in the ordinary course" of its business. AIS contended that relator failed to organize the documents to correspond to its requests for production and alleged that relator's production constituted an impermissible "document dump." AIS further sought information relating to other projects in which relator had been involved; however, relator refused to produce the requested documents on grounds that the documents lacked relevance and the requested discovery constituted an impermissible fishing expedition. After numerous proceedings before the master and trial court pertaining to relator's method of production for documents pertaining to the M11 Contract and AIS's requested discovery pertaining to relator's other projects, the trial court granted relief in favor of AIS, and this original proceeding ensued. Specifically, by order signed on June 3, 2019, the special master recommended relief in favor of AIS and the trial court approved and adopted that recommendation. On August 28, 2019, the trial court denied relator's motion for reconsideration of that ruling.

3

By two issues, relator asserts that the trial court abused its discretion by ordering relator to: (1) "review an estimated 52,000,000 pages of records relating to at least 2,722 unrelated projects spanning a time period from January 1, 2005 to the present to respond to AIS's production requests seeking irrelevant information as to whether [relator] was terminated from, or its work reduced, on any unrelated project, at a cost to relator of over $1,000,000," and (2) "effectively create an 'inventory' of approximately 343,000 pages of documents [relator] previously produced in the format in which they were maintained by identifying each document by Bates number responsive to each of AIS's 150 separate requests for production."

The Court requested and received a response to the petition for writ of mandamus from AIS. *See* TEX. R. APP. P. 52.2, 52.4, 52.8. AIS asserts that relator could have produced the documents as they were kept in the ordinary course of business, or it could have organized the documents to identify each document that responded to each request for production, but relator refused to comply with either option. AIS also asserts that the trial court did not err in ordering relator to produce documents that are central to its claims and to AIS's defenses against those claims.

Relator filed a reply to AIS's response generally reiterating the arguments raised in its petition for writ of mandamus and in support of its right to relief by mandamus.

## II. STANDARD OF REVIEW

Mandamus is an extraordinary remedy issued at the discretion of the court. *In re Garza*, 544 S.W.3d 836, 840 (Tex. 2018) (orig. proceeding) (per curiam). To obtain relief by writ of mandamus, a relator must establish that an underlying order is void or is a clear abuse of discretion and there is no adequate appellate remedy. *In re Nationwide Ins. Co.*

4

*of Am.*, 494 S.W.3d 708, 712 (Tex. 2016) (orig. proceeding); *see In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135–36 (Tex. 2004) (orig. proceeding); *Walker v. Packer*, 827 S.W.2d 833, 839–40 (Tex. 1992) (orig. proceeding).

An abuse of discretion occurs when a trial court's ruling is arbitrary and unreasonable or is made without regard for guiding legal principles or supporting evidence. *In re Nationwide Ins. Co. of Am.*, 494 S.W.3d at 712; *Ford Motor Co. v. Garcia*, 363 S.W.3d 573, 578 (Tex. 2012). We determine the adequacy of an appellate remedy by balancing the benefits of mandamus review against the detriments. *In re Essex Ins. Co.*, 450 S.W.3d 524, 528 (Tex. 2014) (orig. proceeding); *In re Prudential Ins. Co. of Am.*, 148 S.W.3d at 136.

A discovery order that compels production beyond the rules of procedure is an abuse of discretion for which mandamus is the proper remedy. *In re Nat'l Lloyds Ins. Co.*, 449 S.W.3d 486, 488 (Tex. 2014) (orig. proceeding); *In re Deere & Co.*, 299 S.W.3d 819, 820 (Tex. 2009) (orig. proceeding) (per curiam); *Texaco, Inc. v. Sanderson*, 898 S.W.2d 813, 815 (Tex. 1995) (per curiam); *see In re Shipman*, 540 S.W.3d 562, 565 (Tex. 2018) (orig. proceeding) (per curiam). "If an appellate court cannot remedy a trial court's discovery error, then an adequate appellate remedy does not exist." *In re Dana Corp.*, 138 S.W.3d 298, 301 (Tex. 2004) (orig. proceeding).

### III. DISCOVERY

The scope of discovery is generally within the trial court's discretion. *In re Graco Children's Prods., Inc.*, 210 S.W.3d 598, 600 (Tex. 2006) (orig. proceeding) (per curiam); *In re CSX Corp.*, 124 S.W.3d 149, 152 (Tex. 2003) (orig. proceeding) (per curiam). "Parties are 'entitled to full, fair discovery' and to have their cases decided on the merits."

*Ford Motor Co. v. Castillo*, 279 S.W.3d 656, 663 (Tex. 2009) (quoting *Able Supply Co. v. Moye*, 898 S.W.2d 766, 773 (Tex. 1995) (orig. proceeding)). Thus, our procedural rules allow the broad discovery of unprivileged information that is "relevant to the subject matter of the pending action." TEX. R. CIV. P. 192.3(a); *see In re N. Cypress Med. Ctr. Operating Co.*, 559 S.W.3d 128, 131 (Tex. 2018) (orig. proceeding); *In re Nat'l Lloyds Ins. Co.*, 449 S.W.3d at 488. It is not a ground for objection "that the information sought will be inadmissible at trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." TEX. R. CIV. P. 192.3(a).

Information is relevant if it tends to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the information. *See* TEX. R. EVID. 401. The phrase "relevant to the subject matter" is to be broadly construed. *Ford Motor Co.*, 279 S.W.3d at 664; *see In re Nat'l Lloyds Ins. Co.*, 449 S.W.3d at 488. A request "is not overbroad merely because [it] may call for some information of doubtful relevance" so long as it is "reasonably tailored to include only matters relevant to the case." *Texaco, Inc.*, 898 S.W.2d at 815; *see In re Nat'l Lloyds Ins. Co.*, 449 S.W.3d at 488; *In re Graco Children's Prods., Inc.*, 210 S.W.3d at 600. Nevertheless, a party's discovery requests must show a reasonable expectation of obtaining information that will aid in the resolution of the dispute. *In re CSX Corp.*, 124 S.W.3d at 152. A discovery request is "overbroad" when it encompasses "time periods, products, or activities beyond those at issue in the case" and, therefore, is not "reasonably tailored to include only relevant matters." *In re Alford Chevrolet–Geo*, 997 S.W.2d 173, 180 n.1 (Tex. 1999) (orig. proceeding); *see also In re Deere & Co.*, 299 S.W.3d at 820; *In re Graco Children's Prods.*, 210 S.W.3d at 600. Thus, "[a]n order that compels overly

6

broad discovery is an abuse of discretion for which mandamus is the proper remedy." *In re Deere & Co.*, 299 S.W.3d at 820. An overbroad request is improper regardless of whether it is burdensome. *In re Allstate Cty. Mut. Ins. Co.*, 227 S.W.3d 667, 670 (Tex. 2007) (orig. proceeding).

The rules of civil procedure allow the trial court to limit discovery under particular circumstances:

> The discovery methods permitted by these rules should be limited by the court if it determines, on motion or on its own initiative and reasonable notice, that:
>
> (a)     the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; or
>
> (b)     the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

TEX. R. CIV. P. 192.4(b); *see In re Alford Chevrolet–Geo*, 997 S.W.2d at 181. Additionally, the trial court may make protective orders "in the interest of justice" to protect the movant from "undue burden, unnecessary expense, harassment, annoyance, or invasion of personal, constitutional, or property rights" that, among other things, orders that: (1) the requested discovery not be sought in whole or in part; (2) the extent or subject matter of discovery be limited; (3) the discovery not be undertaken at the time or place specified; (4) the discovery be undertaken only by such method or upon such terms and conditions or at the time and place directed by the court; or (5) the results of discovery be sealed or otherwise protected, subject to the provisions of Rule 76a. TEX. R. CIV. P. 192.6(b); *In re United Fire Lloyds*, 578 S.W.3d 572, 578–79 (Tex. App.—Tyler 2019, orig. proceeding).

7

Although a trial court may exercise some discretion in granting a protective order, such discretion is not without bounds. *In re Collins*, 286 S.W.3d 911, 919 (Tex. 2009) (orig. proceeding). The party seeking a protective order must show particular, specific, and demonstrable injury by facts sufficient to justify a protective order. *Id.*

## IV. RELEVANCE, OVERBREADTH, AND BURDENSOMENESS

In its first issue, relator contends that the trial court abused its discretion in ordering relator to "[r]eview an estimated 52,000,000 pages of records relating to at least 2,722 unrelated projects spanning a time period from January 1, 2005 to the present" where the production requests seek "irrelevant information as to whether [relator] was terminated from, or its work reduced, on any unrelated project, at a cost to [relator] of over $1,000,000." Relator specifically asserts that it should not be required to search and produce records from 2,722 unrelated projects over the past fourteen years; the supreme court has prohibited overbroad discovery which is tantamount to a "fishing expedition"; the unrelated projects are irrelevant to the disputed issues in this case; and the disproportionate financial burden on relator outweighs any alleged benefit to AIS.

Through this issue, relator attacks that portion of the trial court's June 3, 2019 order compelling it to respond to AIS's requests for production 127 through 150. In sum, these requests for production seek documents pertaining to all of relator's projects, contracts, and assignments from 2005 to the present other than those pertaining to the M11 Contract. These requests for production are as follows:

127. Documents or communications evidencing or describing . . . a threatened or actual reduction to or removal of Westcon's work scope on a project or assignment at any time during the period beginning January 1, 2005 and continuing through the present, excluding the Project at issue in this suit.

128. Documents or communications evidencing or describing . . . threatened or actual termination, whether full or partial, of Westcon from any project or assignment at any time during the period beginning January 1, 2005 and continuing through the present, excluding the Project at issue in this suit.

129. Documents or communications evidencing or describing Westcon's actual or alleged failure to meet one or more deadline, milestone, target, or goal for a contract, project, or assignment at any time during the period beginning January 1, 2005 and continuing through the present, excluding the Project at issue in this suit.

130. Documents or communications evidencing or describing criticism by any of Westcon's customers, clients, or past or former personnel of such customer or client regarding Westcon's work at any time during the period beginning January 1, 2005 and continuing through the present, excluding the Project at issue in this suit.

131. Documents or communications evidencing or describing criticism by any of Westcon's customers, clients, or past or former personnel of such customer or client regarding Westcon's failure to meet one or more deadline, milestone, target, or goal for a contract, project, or assignment at any time during the period beginning January 1, 2005 and continuing through the present, excluding the Project at issue in this suit.

132. Documents or communications evidencing or describing criticism by someone on a project other than Westcon's customer or client (*e.g.*, a third-party vendor, contractor, supplier) regarding Westcon's work at any time during the period beginning January 1, 2005 and continuing through the present, excluding the Project at issue in this suit.

133. Documents or communications evidencing or describing criticism by someone on a project other than Westcon's customer or client (*e.g.*, a third-party vendor, contractor, supplier) regarding Westcon's failure to meet one or more deadline, milestone, target, or goal for a contract, project, or assignment at any time during the period beginning January 1, 2005 and continuing through the present, excluding the Project at issue in this suit.

134. Documents or communications evidencing or describing criticism by a public or private inspector (*e.g.*, safety, environmental, quality control, compliance, etc.) regarding Westcon's work at any time during the period beginning January 1, 2005 and continuing through the present, excluding the Project at issue in this suit.

135. Documents or communications evidencing or describing criticism by a supervising contractor regarding Westcon's work at any time during the period beginning January 1, 2005 and continuing through the present, excluding the Project at issue in this suit.

136. Documents or communications evidencing or describing criticism by a supervising contractor regarding Westcon's failure to meet one or more deadline, milestone, target, or goal for a contract, project, or assignment at any time during the period beginning January 1, 2005 and continuing through the present, excluding the Project at issue in this suit.

137. Documents or communications evidencing or describing criticism by a project or construction manager regarding Westcon's work at any time during the period beginning January 1, 2005 and continuing through the present, excluding the Project at issue in this suit.

138. Documents or communications evidencing or describing criticism by a project or construction manager regarding Westcon's failure to meet one or more deadline, milestone, target, or goal for a contract, project, or assignment at any time during the period beginning January 1, 2005 and continuing through the present, excluding the Project at issue in this suit.

139. Documents or communications evidencing, identifying, or discussing a disagreement or dispute between Westcon and a customer, client, sub-contractor, third-party (*e.g.*, vendor, supplier, contractor), or manager regarding Westcon's work scope for a contract, project, or assignment at any time during the period beginning January 1, 2005 and continuing through the present, excluding the Project at issue in this suit.

140. Documents or communications evidencing or describing any refusal to sign off on or approve Westcon's work for a contract, project, or assignment at any time during the period beginning January 1, 2005 and continuing through the present, excluding the Project at issue in this suit.

141. For Westcon's contracts, projects, and assignments with its customer or clients over the period January 1, 2005 through the present, but excluding the Project at issue in this suit, please produce the contract documents in their entirety, including without limitation any changes, modifications, exhibits.

10

142. For Westcon's contracts, projects, and assignments over the period January 1, 2005 through the present, but excluding the Project at issue in this suit, please produce Westcon's original proposals or bids including without limitation: proposed scope of work as to Westcon; Westcon's quoted, proposed, or estimated pricing; proposed timing or schedule of Westcon's work; proposed inspection, acceptance, or approval of work.

143. For Westcon's contracts, projects, and assignments over the period January 1, 2005 through the present, but excluding the Project at issue in this suit, please produce Westcon's proposals or bids that were approved by a customer, client, or others, including without limitation: approved scope of work as to Westcon; approved pricing; approved timing or schedule of Westcon's work; or approved schedule for inspection, acceptance, approval of work.

144. For Westcon's contracts, projects, and assignments over the period January 1, 2005 through the present, but excluding the Project at issue in this suit, please produce records showing Westcon's profit or loss for such contract, project, or assignment, including without limitation, QuickBooks or similar accounting data.

145. For Westcon's contracts, projects, and assignments over the period January 1, 2005 through the present, but excluding the Project at issue in this suit, please produce records showing Westcon's expenses, losses, costs, or other reductions, including without limitation, QuickBooks or similar accounting data.

146. For Westcon's contracts, projects, and assignments over the period January 1, 2005 through the present, but excluding the Project at issue in this suit, please produce records showing Westcon's profit or loss for such contract, project, or assignment, including without limitation, QuickBooks or similar accounting data.

147. For Westcon's contracts, projects, and assignments over the period January 1, 2005 through the present, but excluding the Project at issue in this suit, please produce records showing Westcon's report or communications to any government agency pertaining to payments to Westcon Westcon's expenses, or Westcon's profits for such contract, project, or assignment.

148. For Westcon's contracts, projects, and assignments over the period January 1, 2005 through the present, but excluding the Project at issue in this suit, please produce records showing Westcon's report or communication to its shareholders, directors, or anyone else

11

internally pertaining to payments to Westcon, Westcon's expenses, or Westcon's profits for such contract, project, or assignment.

149. For Westcon's contracts, projects, and assignments over the period January 1, 2005 through the present, but excluding the Project at issue in this suit, please produce any claim or notice of claim to Westcon pertaining to such contract, project, or assignment, as well as any related response or other related communications, settlement or payment records, or investigation or analysis.

150. For Westcon's contracts, projects, and assignments over the period January 1, 2005 through the present, but excluding the Project at issue in this suit, please produce any claim or notice of claim from or by Westcon pertaining to such contract, project, or assignment, as well as any related response or other related communications, settlement or payment records, or investigation or analysis.

Relator asserts that the foregoing discovery is overbroad and irrelevant. It supports this assertion with the affidavit of Dennis Chismar, the Vice President of Business Development for relator. Chismar's affidavit provides;

1. My name is Dennis Chismar. I am over eighteen years of age, of sound mind, and am capable of making this affidavit. I am Vice President–Business Development of Bilfinger Westcon, Inc. ("Westcon"). I have been employed with Westcon since September 2009. During this time, I have been employed as the Vice President of Business Development, which is my current role. I have also served as a company officer from [July 2012] to [Currently]. The facts stated within this affidavit are within my personal knowledge and are true and correct.

2. This affidavit is offered in support of Westcon's Motion for Reconsideration of the Court's June 3, 2019 Order on Discovery from May 29, 2019 Hearing with Special Master (the "Discovery Order").

3. I have reviewed the Discovery Order in which Westcon was ordered to produce documentation responsive to Defendant [AIS's] requests for production numbers 127–150. I have also reviewed those specific requests for production. Those requests seek documents for all Westcon projects (other than the voestalpine project) from January 1, 2005 to the present.

4. I have performed a preliminary, personal investigation of Westcon's projects during this fourteen-year timespan. Westcon has been a

part of approximately 2,722 projects from January 1, 2005 to the present. These projects are of varying size, ranging from approximately $50,000.00 to $200,000,000.00. The projects are geographically dispersed across the entire United States of America. The projects also involve varying amounts of records. As part of this preliminary review, I estimate that projects from 2005–2010 included an average of 5,000 items of correspondence and projects from 2011–2019 included an average of 7,500 items of correspondence per project. That amounts to approximately 17,332,500 separate documents and an estimated 52,000,000 pages of records. [An estimate of three pages per document was used for this calculation.]

5. Assuming Westcon could staff one individual full-time to begin compiling these historic records from various archives and sources, I estimate that the compiling project alone—before any documents are actually reviewed—would take one full-time employee three years to complete. This is all before any documents are actually reviewed for responsiveness.

6. In addition to the time and cost to hire a full-time employee, devote IT resources, and additional staff time to pull historic project files, Westcon would also likely incur the costs of engaging a forensic IT consultant to recover historic files and then, ultimately, to do keyword searches to identify potentially responsive documents. At this point, I do not have an estimate for how long such an actual review of the compiled documents would take, but I conservatively estimate that it would take years to review. Again, at this preliminary stage it is difficult to definitively determine, but I estimate that the cost to Westcon to comply with the order will exceed $500,000.00.

7. This will be an extraordinary burden upon Westcon in terms of both cost, time, and monopolization of resources.

8. Everything described above is before the documents identified as responsive are given to our lawyers for review, preparation, and production. Westcon conservatively estimates that the legal fees and expenses associated with the attorney and paralegal work to comply with the order to significantly exceed $500,000.00. As such the total estimated cost to Westcon is likely to exceed $1,000,000.00.

9. The combination of cost, time, and occupation of both Westcon's staff and our legal counsel's personnel is unreasonable and extraordinarily burdensome to Westcon."

(Internal footnote omitted).

13

AIS in turn argues that the foregoing discovery is calculated to lead to relevant evidence supporting its defense against relator's claim for slander and "calculated to shed light on [relator's] reputation for shoddy work and possible reasons why voest's construction managers questioned the quality of [relator's] work." As stated previously, relator contends that it was wrongfully terminated from the voest project because the real parties in interest "deliberately sabotaged" relator's work and "wrongfully disparaged" its work to voest "without reasonable basis." Thus, AIS asserts that requests for production 127–150 seek discovery that is relevant to its "truth" defense against relator's claims. We note that relator contends that it has a "reputation for quality" in its fourth amended petition and that seventy percent of its business volume is "repeat" business.

We turn our attention to the requests for production at issue. We evaluate the relevancy of discovery on a case-by-case basis by considering, among other things, the pleadings and the instrumentality of the alleged injury. *In re Sun Coast Res., Inc.*, 562 S.W.3d 138, 146 (Tex. App.—Houston [14th Dist.] 2018, orig. proceeding); *see also In re Methodist Primary Care Grp.*, No. 14-17-00299-CV, 2017 WL 3480292, at *2 (Tex. App.—Houston [14th Dist.] Aug. 14, 2017, orig. proceeding) (mem. op.). As stated previously, a discovery request is "overbroad" when it encompasses "time periods, products, or activities beyond those at issue in the case" and, therefore, is not "reasonably tailored to include only relevant matters." *In re Alford Chevrolet–Geo*, 997 S.W.2d at 180 n.1 (Tex. 1999) (orig. proceeding); *see also In re Deere & Co.*, 299 S.W.3d at 820; *In re Graco Children's Prods.*, 210 S.W.3d at 600; *In re Waste Mgmt. of Tex., Inc.*, 392 S.W.3d 861, 871 (Tex. App.—Texarkana 2013, orig. proceeding). "[A] discovery request that is unlimited as to time, place, or subject matter is overly broad as a matter of law." *In re*

14

*United Fire Lloyds*, 578 S.W.3d at 580; *see In re Xeller*, 6 S.W.3d 618, 626 (Tex. App.—Houston [14th Dist.] 1999, orig. proceeding). For instance, "[d]iscovery orders requiring production from an unreasonably long period . . . are impermissibly overbroad." *In re CSX Corp.*, 124 S.W.3d at 152.

The requests for production at issue here span a fourteen-year period from January 1, 2005 to present and are unlimited in geographic scope. Chismar testified that the requests encompass approximately 2,722 projects of varying size, ranging from approximately $50,000.00 to $200,000,000.00, and these projects are geographically dispersed across the United States. AIS does not directly address the period of time or geographic region encompassed by its requests for production and offers no arguments that directly support the requested scope of discovery.

We examine the controlling precedent issued by the Texas Supreme Court regarding overbreadth of discovery. *See In re Ford Motor Co.*, 427 S.W.3d 396, 397 (Tex. 2014) (orig. proceeding) (per curiam); *K Mart Corp. v. Sanderson,* 937 S.W.2d 429, 431 (Tex. 1996) (orig. proceeding) (per curiam); *Dillard Dep't Stores, Inc. v. Hall*, 909 S.W.2d 491, 491–92 (Tex. 1995) (orig. proceeding) (per curiam). For example, the supreme court held that a discovery request for "financial and business information for all cases . . . for a period covering twelve years" was "just the type of overbroad discovery the rules are intended to prevent." *In re Ford Motor Co.*, 427 S.W.3d at 397. In *K Mart Corporation v. Sanderson*, the supreme court held that a request for every criminal act that occurred on the defendant's premises for the last seven years was overbroad. 937 S.W.2d at 431. Similarly, in *Dillard Department Stores, Inc. v. Hall*, the supreme court held overbroad a

15

request for every false imprisonment case in the last five years throughout twenty states. 909 S.W.2d at 491–92.

Utilizing these examples from the Texas Supreme Court, we conclude that requests for production 127–150 are overbroad insofar as they span a fourteen-year period without geographic limitation and the record fails to reflect that discovery for this period and place is relevant. *See In re Ford Motor Co.*, 427 S.W.3d at 397; *K Mart Corp.*, 937 S.W.2d at 431; *Dillard Dep't Stores, Inc.*, 909 S.W.2d at 491–92.

We turn our attention to the substantive scope of these requests for production. Some of the requests for production seek the production of documents pertaining to all of relator's contracts, projects, and assignments, other than the one at issue in this lawsuit, without limitation. These requests are overbroad. *See In re Ford Motor Co.*, 427 S.W.3d at 397; *K Mart Corp.*, 937 S.W.2d at 431; *Dillard Dep't Stores, Inc.*, 909 S.W.2d at 491–92. Those requests which are unlimited as to subject matter include requests for production 141–150.

We note, in contrast, that other requests for production are arguably limited in subject matter to issues that appear relevant to AIS's alleged "truth" defense against relator's claims for disparagement and slander. We refer specifically to those requests seeking documents pertaining to relator's performance on other projects. These requests for production include those regarding: threatened or actual reduction to or removal of relator's work scope on a project or assignment (127); threatened or actual termination, whether full or partial, of relator from any project or assignment (128); relator's actual or alleged failure to meet one or more deadline, milestone, target, or goal for a contract, project, or assignment (129); documents or communications evidencing or describing

16

criticism by any of relator's customers, clients, or past or former personnel of such customer or client regarding relator's work (130); criticism by any of relator's customers, clients, or past or former personnel of such customer or client regarding relator's failure to meet one or more deadline, milestone, target, or goal for a contract, project, or assignment (131); criticism by someone on a project other than relator's customer or client (*e.g.*, a third-party vendor, contractor, supplier) regarding relator's work (132); criticism by someone on a project other than relator's customer or client (*e.g.*, a third-party vendor, contractor, supplier) regarding relator's failure to meet one or more deadline, milestone, target, or goal for a contract, project, or assignment (133); criticism by a public or private inspector (*e.g.*, safety, environmental, quality control, compliance, etc.) regarding relator's work (134); criticism by a supervising contractor regarding relator's work (135); criticism by a supervising contractor regarding relator's failure to meet one or more deadline, milestone, target, or goal for a contract, project, or assignment (136); criticism by a project or construction manager regarding relator's work (137); and criticism by a project or construction manager regarding relator's failure to meet one or more deadline, milestone, target, or goal for a contract, project, or assignment (138). Nevertheless, while these discovery requests seek relevant information, they could have been more narrowly tailored in scope, *i.e.*, in terms of temporal and geographical limits, to seek only relevant information and avoid obtaining information of dubious relevance. *See In re Allstate*, 227 S.W.3d at 669 (noting that discovery requests that are overbroad as to time, location, and scope and that can easily be more narrowly tailored to the dispute at hand are improper); *see also In re Deere & Co.*, 299 S.W.3d at 821.

We sustain relator's first issue.

## V. FORMAT FOR PRODUCTION

In its second issue, relator asserts the court's order requiring it "to effectively inventory its prior document production contravenes established precedent." Relator specifically contends (1) the Texas Supreme Court has held that a party cannot be forced to create an inventory of produced documents, (2) the court's order improperly violates protected attorney work-product, (3) the enormous burden on relator to create an inventory is unjustified without evidence of benefit to AIS, and (4) alternatively, AIS should have been required to bear any costs associated with the production. As it pertains to this issue, the trial court's order specifically provides:

> AIS's motion to compel more definite responses to AIS' First and Second Sets of Requests for Production to [relator] is granted as to the manner in which [relator] must respond. Specifically, [relator] shall amend its responses to both sets of AIS's Requests for Production to identify each tangible item responsive to each Request for Production or by general categories of documents so that all parties and the Court may know what documents and things produced by [relator] are responsive to each individual request. Where [relator] has no documents in its possession or subject to its control responsive to one or more requests, it shall state "none." [Relator] must comply with the same requirements in amending its responses to HEMI's First Set of Request for Production Nos. 49, 58, 65, and HEMI's Second Set of Request for Production Nos. 101–108. [Relator] must amend all responses to AIS's Requests for Production and HEMI's specifically identified Requests for Production on or before August 30, 2019.

We address relator's contentions in turn.

### A. Inventory

Relator argues that it is being required to "effectively inventory" its prior production and that, under supreme court precedent, it cannot be "forced to create an inventory" of produced documents. We agree with relator's contention to the extent that the rules do not permit a trial court to order parties to create documents for the purposes of discovery.

18

*In re Colonial Pipeline Co.*, 968 S.W.2d 938, 942 (Tex. 1998) (orig. proceeding); *In re Preventative Pest Control Houston, LLC*, 580 S.W.3d 455, 460 (Tex. App.—Houston [14th Dist.] 2019, orig. proceeding); *In re Guzman*, 19 S.W.3d 522, 525 (Tex. App.—Corpus Christi–Edinburg 2000, orig. proceeding) *see also* TEX. R. CIV. P. 192.3 ("A person is required to produce a document or tangible thing that is within the person's possession, custody, or control.").

However, here, the trial court's order requires no such thing and instead requires relator to "amend its responses" to the requests for production "to identify each tangible item responsive to each" request for production "or by general categories of documents." As we will discuss in connection with relator's other arguments, the trial court's order tracks the language of the Texas Rules of Civil Procedure. Accordingly, we reject relator's arguments to the extent that they are premised on the creation of a document or "inventory." We proceed with our analysis accordingly.

We have previously addressed and rejected arguments similar to those made by relator. *See generally In re Exmark Mfg. Co.*, 299 S.W.3d 519 (Tex. App.—Corpus Christi–Edinburg 2009, orig. proceeding [mand. dism'd]). In that case, Exmark complained that the trial court's discovery order unreasonably restricted its options and forced it to comply with requirements outside the scope of the rules of civil procedure. *Id.* at 532. The trial court's order in that case required Exmark to "identify each . . . tangible item responsive to each Request for Production or by general categories of documents." *Id.* Exmark argued that the order compelled it to "organize its production in a manner more restrictive than the rules allow" because it eliminated its ability to produce documents as they were kept in the normal course of business. *Id.* We concluded that

19

the order was not an abuse of discretion because "the rules expressly and explicitly allow for the mode of production specified by the trial court" and the trial court's order was "less onerous than authorized by the rules" because it allowed Exmark to identify each item by "general categories of documents." *Id.*

We conclude likewise here. Texas Rule of Civil Procedure 196.3(c) requires the responding party to "either produce documents and tangible things as they are kept in the usual course of business or organize and label them to correspond with the categories in the request." TEX. R. CIV. P. 196.3(c); *see Porretto v. Tex. Gen. Land Office*, 448 S.W.3d 393, 403 (Tex. 2014). Rule 193.1 provides, in pertinent part, that the "responding party's answers, objections, and other responses must be preceded by the request to which they apply." TEX. R. CIV. P. 193.1. The trial court's order comports with these requirements and, as in *Exmark*, is less burdensome than required by the rules because it allows relator to either "identify each tangible item responsive to each" request for production "or by general categories of documents." Accordingly, we conclude that the trial court did not abuse its discretion in this regard. TEX. R. CIV. P. 193.1; *id.* R. 196.3(c); *In re Exmark Mfg. Co.*, 299 S.W.3d at 532; *see also In re F.C. Holdings, Inc.*, 349 S.W.3d 811, 816 (Tex. App.—Tyler 2011, orig. proceeding) (stating that the party's "failure to organize and identify those pages" in responses to requests for production violated the rules of civil procedure); *see also In re Hite*, No. 12-18-00121-CV, 2018 WL 2715300, at *3–4 (Tex. App.—Tyler June 6, 2018, orig. proceeding) (mem. op.) (holding that "it was not unreasonable for Respondent to require compliance with Rule 193.1's requirement that answers, objections, and other responses be preceded by the applicable request").

**B. Attorney Work Product**

Relator contends that the trial court's order improperly violates the attorney work product privilege. Relator asserts that requiring it to identify documents responsive to each of AIS's production requests "necessarily requires it to reveal privileged work-product because it will involve the disclosure of its counsels' thought processes and legal strategy." Relator argues that its "lawyers' decisions as to the documents responsive to each of AIS's over 150 production requests will highlight their opinions as to the relevancy of certain information, and potentially their trial strategy."

The primary purpose of the attorney work product doctrine is to shelter the mental processes, conclusions, and legal theories of the attorney so that the lawyer can analyze and prepare the case. *In re Nat'l Lloyds Ins. Co.*, 532 S.W.3d 794, 803–04 (Tex. 2017) (orig. proceeding). The rules of procedure define "work product" as:

(1)  material prepared or mental impressions developed in anticipation of litigation or for trial by or for a party or a party's representatives . . .; or

(2)  a communication made in anticipation of litigation or for trial between a party and the party's representatives or among a party's representatives, including the party's attorneys [and] consultants.

TEX. R. CIV. P. 192.5(a). Certain matters are expressly excluded from the definition of "work product," however, and are not protected from discovery even if made or prepared in anticipation of litigation or for trial. *In re Nat'l Lloyds Ins. Co.*, 532 S.W.3d at 803. Core work product—work product that contains "the mental impressions, opinions, conclusions, or legal theories" of an attorney or an attorney's representative—is not discoverable, but a trial court may order disclosure of noncore work product—defined as

21

"[a]ny other work product" that is not core work product—only if the requesting party shows substantial need and undue hardship. *Id.* at 804 (quoting Tex. R. Civ. P. 192.5(b)).

Relator's contention is nonsensical. If we were to accept relator's premise, then all parties who have responded to requests for production by the "organization and label" method as opposed to "the ordinary course of business" have revealed attorney work product. Requiring relator to comply with the rules of civil procedure and produce documents and tangible things and "organize and label them to correspond with the categories in the request" does not violate the attorney work product doctrine. Tex. R. Civ. P. 196.3(c); *see Porretto*, 448 S.W.3d at 403. Further, relator's argument was not presented to the trial court and there is no showing that any such presentation would have been futile. Equity generally is not served by issuing an extraordinary writ against a judge on a ground that was never presented in the trial court and that the judge thus had no opportunity to address. *See In re Jarvis*, 431 S.W.3d 129, 139 (Tex. App.—Houston [14th Dist.] 2013, no pet.); *In re Le*, 335 S.W.3d 808, 814 (Tex. App.—Houston [14th Dist.] 2011, orig. proceeding).

### C. Burden

Relator further contends that "the enormous burden" required "to create an inventory" is unjustified without evidence of benefit to AIS. Relator asserts that it filed evidence of the "extraordinary" burden of creating the requested inventory. In support of this argument, it points to the affidavit of its attorney, R. Blake Runions. Runions testified by affidavit as follows:

> 1. My name is R. Blake Runions. I am over eighteen years of age, of sound mind, and am capable of making this affidavit. I am an attorney and am licensed to practice law in the State of Texas. I have practiced law in Harris County, Texas since 2007. I am a partner

22

with the law firm of Porter Hedges LLP and trial counsel for Bilfinger Westcon, Inc. ("Westcon"). The facts stated within this affidavit are within my personal knowledge and are true and correct.

2. This affidavit is offered in support of Westcon's Brief Related to HEMI and AIS's Request that Westcon be Ordered to Create a Discovery Index.

3. I have performed a personal investigation of Westcon's production in this lawsuit as well as consulted with the paralegal staffed to this matter and the Litigation Support Group within Porter Hedges that works with us on electronic discovery.

4. Westcon has produced more than 61,000 documents, totaling more than 343,000 pages, of project files and other requested documents in this case related to the voestalpine Project. In addition, Westcon has also produced arbitration exhibits, witness statements, and pleadings in two separate arbitration proceedings that involved the voestalpine Project. The arbitration documents include hundreds more documents and thousands of more pages. This data amounts to approximately 200 Gigabytes of data.

5. In order to comply with HEMI and AIS's request that Westcon index its produced documents and include the Bates-number of every document within the response to each of the 110 requests for production, Westcon would be forced to have attorneys or paralegals review each document, determine which of the 110 requests each document was responsive (and likely many of the documents would be responsive to more than one request), and then type the appropriate Bates-numbers into each response.

6. I have been involved in numerous document review projects over the course of my career, including supervising large review projects within the last year. I would estimate that using the process described above, reviewers would average no more than 50 documents per hour (and potentially less). As such, it would likely take over 1,220 hours [61,000 documents divided by 50 documents per hour = 1,220] to complete the review, determine which RFP's were relevant, and create such a discovery index.

7. Such a task would be extraordinarily costly to Westcon in fees and expenses. Assuming a blended rate of $250 per hour, which is significantly below the hourly rates of the attorneys currently working on this case, Westcon would incur over $300,000 in fees [1,220 hours times $250 per hour = $305,000] to create such a discovery index.

8.  Even if Porter Hedges could dedicate 10 attorneys to complete this project, those attorneys would assume an added 122 hours of work per person [1,220 hours divided by 10 persons = 122 hours per person] to complete this task. If Westcon were granted 60 days (or two months) to complete this massive project, each of those 10 reviewers would need to spend more than 60 hours per month [122 hours per person divided by 2 months = 60 + hours per person] on this work. Porter Hedges's entire litigation department contains 39 attorneys. Therefore, this would require the firm to potentially dedicate 25% of the entire litigation department to this task, which simply may not be feasible. Westcon has never had 10 attorneys working on this case.

9.  The combination of cost, time, and occupation of counsel's personnel is unreasonable and extraordinarily burdensome to Westcon.

10. Further, if the 343,000 pages of documents were divided equally between each of HEMI's 110 requests for production, each response would include over 3,100 Bates-numbers [343,000 pages divided by 110 requests = 3,118 Bates-number references per request]. That average is highly likely to be even greater because many of the documents would likely be responsive to more than one of the RFPs."

In contrast, AIS asserts that any burden or cost to relator is "irrelevant because it springs from [relator's] own decision not to produce documents as it kept them in the ordinary course of business, but rather to consolidate millions of documents into a single data dump." AIS further asserts that a proportionality analysis is irrelevant to the question of whether a party must comply with the Texas Rules of Civil Procedure.

Relator's arguments here are premised on the concept that discovery may be limited if the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues. T EX. R. CIV. P. 192.4; *In re Weekley Homes, LP*, 295

24

S.W.3d 309, 317 (Tex. 2009) (orig. proceeding); *In re Stern*, 321 S.W.3d 828 (Tex. App.—Houston [1st Dist.] 2010, orig. proceeding).   The fact that a discovery request is burdensome is not enough to justify protection; "it is only undue burden that warrants nonproduction." *ISK Biotech Corp. v. Lindsay*, 933 S.W.2d 565, 568 (Tex. App.—Houston [1st Dist.] 1996, no pet.); *see In re Alford Chevrolet–Geo*, 997 S.W.2d at 181; *In re Energas Co.*, 63 S.W.3d 50, 55 (Tex. App.—Amarillo 2001, orig. proceeding).   A party resisting discovery cannot make conclusory allegations that the requested discovery is unduly burdensome but must instead produce some evidence supporting its request for a protective order.  *In re Alford Chevrolet–Geo*, 997 S.W.2d at 181; *In re Energas Co.*, 63 S.W.3d at 55.

We assume, without deciding, that the proportionality analysis applies to the Rule 196.3 requirement to produce documents as kept in the ordinary course of business or organized and labeled to correspond with the categories in the request for production. *See* TEX. R. CIV. P. 192.4 (providing that the "discovery methods permitted by these rules" may be limited under specified circumstances).  However, we nevertheless conclude that the trial court acted within its discretion in requiring relator to organize and label its responses.

First, the trial court could reasonably have concluded that that the burden of organizing and labeling responses did not outweigh its likely benefit.  *See* TEX. R. CIV. P. 192.4; *In re Weekley Homes, LP*, 295 S.W.3d at 317.  The documents pertaining to the M11 Contract are central to the controversy at hand and are essential for the needs of the case.  While relator argues that compliance with the trial court's order would be extraordinarily expensive, it is not unduly expensive when compared to the amount in

25

controversy. Relator already obtained an arbitration award of $28,600,000 on the contract at issue. Based on relator's pleadings, relator seeks monetary relief "over $1,000,000.00" and exemplary damages in the amount of $6,750,000. According to Chismar's affidavit, relator appears to have substantial resources given that it "has been a part of approximately 2,722 projects" with renumeration "ranging from approximately $50,000.00 to $200,000,000.00." The parties' business reputations are at stake in this litigation, and the discovery regarding the M11 Contract is fundamental to resolving the claims made between the parties.

Second, we note that relator could have, but did not, produce the M11 Contract documents as they were kept in the ordinary course of business. *See* TEX. R. CIV. P. 196.3(c); *Porretto*, 448 S.W.3d at 403. Based on the record provided, it appears that relator produced approximately 200,000 Bates-numbered pages in portable document format (PDF) and one single data file of 200 gigabytes of electronically stored data. None of the documents or data were organized as they would have been in the ordinary course of business, and the documents and data were not otherwise organized or labeled to correspond with the requests for production. Instead, relator chose essentially to compress and compile all of the arbitration documentation into one file. We note that a discovery request will not result in an undue burden when the burdensomeness of responding to it is the result of the responding party's own "conscious, discretionary decisions." *ISK Biotech Corp.*, 933 S.W.2d at 569; *see In re Whiteley*, 79 S.W.3d 729, 734–35 (Tex. App.—Corpus Christi–Edinburg 2002, orig. proceeding); *see also In re Brookfield Infrastructure Grp., LLC*, No. 13-17-00486-CV, 2018 WL 1725467, at *12 (Tex. App.—Corpus Christi–Edinburg Apr. 9, 2018, orig. proceeding) (mem. op.).

26

We conclude that it was not unreasonable for the trial court to require compliance with Rule 193.1's requirement that answers, objections, and other responses be preceded by the applicable request. *See* TEX. R. CIV. P. 193.1, 196.3(c); *In re CSX Corp.*, 124 S.W.3d at 152 (trial court must make efforts to impose reasonable discovery limits); *see also Texaco, Inc. v. Dominguez*, 812 S.W.2d 451, 458 (Tex. App.—San Antonio 1991, orig. proceeding) ("We do not find it unreasonable for the trial court, in an effort to clarify discovery and meet the purposes of discovery (to try cases based on what the facts reveal, not what they conceal), to order the party producing the documents, and who is most familiar with them, to identify which documents satisfy which request"). Accordingly, we overrule relator's second issue.

### D. Costs

In the alternative to the foregoing arguments, relator contends that the trial court should have shifted the cost of its response to the requests for production to AIS. Relator's argument is premised on the concept that the proportionality factors under the rules "preponderate against a request in a specifically requested form." We have rejected this contention and need not further address this matter here. We further note that any alleged error with regard to cost-shifting, if any, can be remedied by appeal. *See In re Waste Mgmt. of Tex., Inc.*, 392 S.W.3d at 877 (concluding that the any error in assessing the costs of responding to discovery "can be fully remedied on appeal" and thus mandamus is not available).

### VI. CONCLUSION

The Court, having examined and fully considered relator's petition for writ of mandamus, the response filed by AIS, the reply, and the applicable law, is of the opinion

that relator has met its burden, in part, to obtain relief. Accordingly, we conditionally grant relator's petition for writ of mandamus as to the overbreadth of the requested discovery. We direct the trial court to vacate that portion of the June 3, 2019 order which requires relator to produce its documentation and other discovery items responsive to AIS's second set of requests for production 127–150. See *In re Master Flo Valve Inc.*, 485 S.W.3d 207, 214 (Tex. App.—Houston [14th Dist.] 2016, orig. proceeding). Our writ will issue only if the trial court fails to comply. We deny all other relief sought.

NORA L. LONGORIA
Justice

Delivered and filed the
12th day of December, 2019.