

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-25-00081-CV

## IN RE DWIGHT CAPITAL, LLC

Original Mandamus Proceeding[1]

Opinion by:     Lori I. Valenzuela, Justice

Sitting:     Rebeca C. Martinez, Chief Justice
Lori I. Valenzuela, Justice
H. Todd McCray, Justice

Delivered and Filed: July 2, 2025

PETITION FOR WRIT OF MANDAMUS GRANTED IN PART AND DENIED IN PART

Relator Dwight Capital, LLC filed a petition for writ of mandamus that challenged the trial

court's January 15, 2025 order compelling it to respond to seven requests for production ("RFPs")

propounded by real parties in interest Terravista Corporation, Terravista Partners, Ltd., Terravista

Partners—Pecan Manor, Ltd., Terravista Partners—Roselawn, Ltd., Terravista Partners—Spanish

Spur, Ltd., Terravista Partners—Westwood, Ltd., and Terravista Partners—Winston Square, Ltd.

(collectively, "Terravista"). We grant the petition in part and deny it in part.

---

[1] This proceeding arises out of Cause No. 2021-CI-06080, styled *Terravista Corporation, Terravista Partners, Ltd., Terravista Partners—Pecan Manor, Ltd., Terravista Partners—Roselawn, Ltd., Terravista Partners—Spanish Spur, Ltd., Terravista Partners—Westwood, Ltd., and Terravista Partners—Winston Square, Ltd. v. Dwight Capital, LLC, Dwight Bridge Fund, LLC, United Core Management, Inc., United Apartment Group Management, Inc., DBDK Venture I LP, DBDK SPE I LP, AMG Realty Group, LLC, and Adam Glickman*, pending in the 73rd Judicial District Court, Bexar County, Texas. The Honorable Rosie Alvarado, presiding judge of the 438th Judicial District Court, signed the order at issue in this original proceeding.

## BACKGROUND

The underlying dispute arises out of Terravista's desire to obtain real estate financing from the United States Department of Housing and Urban Development ("HUD"). In 2017, Terravista owned several multi-family apartment complexes that the parties refer to as "the HUD Portfolio." Shortly before its then-existing loans on the HUD Portfolio matured, it decided to refinance through HUD's Section 223(f) program.[2] Terravista also needed bridge loans to pay off its existing financing. Terravista alleges that Dwight Capital held itself out as a specialist in securing these types of loans and that it hired Dwight Capital in reliance on those representations.

Terravista alleges that between 2017 and 2019, Dwight Capital dragged out the Section 223(f) process, coerced Terravista into accepting bridge loans from a newly formed Dwight Capital affiliate, and colluded with other affiliates to take over management of the HUD Portfolio and interfere with Terravista's attempts to sell the properties. Terravista contends that because of Dwight Capital's actions, it was unable to pay its debts and "was forced to file for Chapter 11 bankruptcy and sell, at 'fire sale' prices," part of the HUD Portfolio.

Dwight Capital contends that the parties settled their dispute in March 2019; however, Terravista argues that the settlement agreement is invalid. Two years after the disputed settlement, Terravista sued Dwight Capital. When Dwight Capital filed this original proceeding, Terravista's live claims included breach of contract, statutory fraud, civil conspiracy to commit fraud, and breach of fiduciary duty.

---

[2] A HUD website cited in Dwight Capital's petition for writ of mandamus describes the Section 223(f) program as a type of "FHA [Federal Housing Administration] mortgage insurance for HUD-approved lenders" that "insures mortgage loans to facilitate the purchase or refinancing of existing multifamily rental housing." U.S. Dep't of Hous. & Urban Dev., *Mortgage Insurance for Purchase or Refinancing of Existing Multifamily Rental Housing: Sections 207/223(f)*(updated Oct. 11, 2023), *available at* https://www.hud.gov/program_offices/housing/mfh/progdesc/purchrefi223f (last accessed June 23, 2025).

On December 4, 2024, Terravista filed a motion to compel Dwight Capital to respond to the following RFPs:

> REQUEST FOR PRODUCTION NO. 46: All documents relating to prior regulatory enforcement actions brought against Dwight Capital by HUD.

> REQUEST FOR PRODUCTION NO. 47: All documents relating to prior regulatory enforcement actions threatened against Dwight Capital by HUD.

> REQUEST FOR PRODUCTION NO. 48: All documents relating to prior regulatory enforcement actions brought against Dwight Capital by any federal or state agency having jurisdiction over your operations.

> REQUEST FOR PRODUCTION NO. 49: All documents relating to prior regulatory enforcement actions threatened against Dwight Capital by any federal or state agency having jurisdiction over your operations.

> REQUEST FOR PRODUCTION NO. 50: All documents relating to the $16 million civil money penalty that Dwight Capital agreed to with HUD, which the HUD Mortgagee Review Board approved on or about September 15, 2022.

> REQUEST FOR PRODUCTION NO. 51: All documents relating to the 24 life-of-loan indemnifications that Dwight Capital agreed to with HUD, which the HUD Mortgagee Review Board approved on or about September 15, 2022.

> REQUEST FOR PRODUCTION NO. 52: All documents relating to the corrective action plan that Dwight Capital agreed to with HUD, which the HUD Mortgagee Review Board approved on or about September 15, 2022.

The motion to compel cited portions of the Federal Register that described the agreement referenced in RFPs 50, 51, and 52 ("the HUD settlement") as follows:[3]

> *Action:* On September 15, 2022, the [HUD Mortgagee Review] Board voted to enter into a settlement agreement with Dwight Capital LLC ("Dwight") that included a civil money penalty of $16,000,000, execution of 24 life-of-loan indemnifications, and a corrective action plan. The settlement did not constitute an admission of liability or fault.

> *Cause:* The Board took this action based on the following alleged violations of FHA requirements: Dwight (a) obtained loan fees in excess of five percent for five loans that received reduced MIP rates under FHA's Green MIP Program; (b) engaged in prohibited business practices, (c) failed to adopt a Quality Control ("QC") Program that fully complied with HUD requirements; (d) failed to comply

---

[3] The HUD settlement is distinct from the parties' purported March 2019 settlement.

with its QC Program, (e) engaged in business practices that do not conform to generally accepted practices of prudent mortgagees; (f) failed to disclose identity of interest ("IOI") relationships; (g) failed to properly disclose and review IOI borrowers; (h) submitted to FHA false statements and false certifications; (i) submitted false information to the Mortgagee Review Board; and (j) violated use and disclosure requirements regarding brokers.

In response to the motion to compel, Dwight Capital argued that the RFPs did not "seek any information relating to Terravista or the allegations made in this case." Dwight Capital contended the RFPs were overbroad, irrelevant, and unduly burdensome to the extent that they amounted to "an impermissible 'fishing expedition.'" The response included an affidavit in which Dwight Capital's CEO, Benjamin Siegel, averred, "To my knowledge, Dwight Capital's dealings with Terravista are not, and have not ever been, the subject of any regulatory enforcement action that has been brought or threatened against Dwight Capital by HUD or any other agency." Siegel also averred that "the HUD settlement did not concern Terravista or arise out of any of Dwight's dealings with Terravista" and that Terravista's allegations "are not similar to, and do not overlap in any material respect with, the allegations that were the subject of the HUD settlement."

During a December 20, 2024 hearing, the trial court orally granted Terravista's motion to compel. It later signed a January 15, 2025 written order that directed Dwight Capital to produce the following documents:

> REQUEST FOR PRODUCTION NO. 46: Any nonprivileged internal and external correspondence, civil money penalties, settlement agreements, indemnity agreements, corrective action plans, and other similar documents relating to prior regulatory enforcement actions brought against Dwight Capital by HUD concerning conduct alleged to have occurred between March 2017 and May 2019.

> REQUEST FOR PRODUCTION NO. 47: Any nonprivileged internal and external correspondence, civil money penalties, settlement agreements, indemnity agreements, corrective action plans, and other similar documents relating to prior regulatory enforcement actions threatened against Dwight Capital by HUD concerning conduct alleged to have occurred between March 2017 and May 2019.

REQUEST FOR PRODUCTION NO. 48: Any nonprivileged internal and external correspondence, civil money penalties, settlement agreements, indemnity agreements, corrective action plans, and other similar documents relating to prior regulatory enforcement actions brought against Dwight Capital by any federal or state agency having jurisdiction over your operations concerning conduct alleged to have occurred between March 2017 and May 2019.

REQUEST FOR PRODUCTION NO. 49: Any nonprivileged internal and external correspondence, civil money penalties, settlement agreements, indemnity agreements, corrective action plans, and other similar documents relating to prior regulatory enforcement actions threatened against Dwight Capital by any federal or state agency having jurisdiction over your operations concerning conduct alleged to have occurred between March 2017 and May 2019.

REQUEST FOR PRODUCTION NO. 50: Any nonprivileged internal and external correspondence, civil money penalties, settlement agreements, indemnity agreements, corrective action plans, and other similar documents relating to the $16 million civil money penalty that Dwight Capital agreed to with HUD, which the HUD Mortgagee Review Board approved on or about September 15, 2022. The foregoing request is limited to documents generated prior to or in connection with Dwight Capital's entry into the aforementioned settlement with HUD; provided, however, this request also applies to any subsequently-generated documents concerning Dwight Capital's compliance with that settlement, and any alleged or actual breach of that settlement.

REQUEST FOR PRODUCTION NO. 51: Any nonprivileged internal and external correspondence, civil money penalties, settlement agreements, indemnity agreements, corrective action plans, and other similar documents relating to the 24 life-of-loan indemnifications that Dwight Capital agreed to with HUD, which the HUD Mortgagee Review Board approved on or about September 15, 2022. The foregoing request is limited to documents generated prior to or in connection with Dwight Capital's entry into the aforementioned settlement with HUD; provided, however, this request also applies to any subsequently-generated documents concerning Dwight Capital's compliance with that settlement, and any alleged or actual breach of that settlement.

REQUEST FOR PRODUCTION NO. 52: Any nonprivileged internal and external correspondence, civil money penalties, settlement agreements, indemnity agreements, corrective action plans, and other similar documents relating to the corrective action plan that Dwight Capital agreed to with HUD, which the HUD Mortgagee Review Board approved on or about September 15, 2022. The foregoing request is limited to documents generated prior to or in connection with Dwight Capital's entry into the aforementioned settlement with HUD; provided, however, this request also applies to any subsequently-generated documents concerning Dwight Capital's compliance with that settlement and implementation of the

corrective action plan, and any alleged or actual breach of that settlement or corrective action plan.

On February 6, 2025, Dwight Capital filed this original proceeding challenging the trial court's order. Terravista filed a response to the petition, and Dwight Capital filed a reply.

## ANALYSIS

### *Standard of Review*

Mandamus is an extraordinary remedy that will issue only to correct a clear abuse of discretion when the relator has no adequate remedy by appeal. *In re Sw. Bell Tel. Co., L.P.*, 235 S.W.3d 619, 623 (Tex. 2007) (orig. proceeding). A trial court abuses its discretion if its ruling "is so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *In re K&L Auto Crushers, LLC*, 627 S.W.3d 239, 247 (Tex. 2021) (orig. proceeding) (internal quotation marks omitted). To be entitled to mandamus relief, the relator must establish that the trial court could have only reasonably reached one conclusion. *Id.*

In determining whether a relator has an adequate remedy by appeal, we balance the benefits of mandamus review against the detriments. *In re Essex Ins. Co.*, 450 S.W.3d 524, 528 (Tex. 2014) (orig. proceeding) (per curiam). "A discovery order that compels production beyond the rules of procedure is an abuse of discretion for which mandamus is the proper remedy." *In re Nat'l Lloyds Ins. Co.*, 449 S.W.3d 486, 488 (Tex. 2014) (orig. proceeding) (per curiam); *In re BCL St. Anthony JV, LP*, No. 04-23-00847-CV, 2024 WL 604752, at *3 (Tex. App.—San Antonio Feb. 14, 2024, orig. proceeding) (mem. op.).

### *Applicable Law*

"The primary objective of discovery is to ensure that lawsuits are decided by what the facts reveal, not by what facts are concealed." *In re Alford Chevrolet-Geo*, 997 S.W.2d 173, 180 (Tex. 1999) (orig. proceeding) (internal quotation marks omitted). Generally, a party may obtain

discovery on "any unprivileged information that is relevant to the subject of the action, even if it would be inadmissible at trial, as long as the information sought is 'reasonably calculated to lead to the discovery of admissible evidence.'" *In re CSX Corp.*, 124 S.W.3d 149, 152 (Tex. 2003) (orig. proceeding) (per curiam) (quoting TEX. R. CIV. P. 192.3(a)). A trial court has broad discretion in making discovery rulings. *In re K&L Auto Crushers*, 627 S.W.3d at 247; *see also* TEX. R. CIV. P. 192.3, 192.4, 192.6.

While the trial court's discretion in this area is broad, it is well-established that "only relevant evidence is discoverable[.]" *In re Nat'l Lloyds Ins. Co.*, 532 S.W.3d 794, 808 (Tex. 2017) (orig. proceeding); *see also* TEX. R. EVID. 401 (defining relevance). If a discovery request is overbroad, it seeks irrelevant—and thus undiscoverable—information. *See In re UPS Ground Freight, Inc.*, 646 S.W.3d 828, 832 (Tex. 2022) (orig. proceeding) (per curiam). A discovery request is overbroad if it is not reasonably "tailored with regard to time, place, or subject matter[.]" *In re Nat'l Lloyds Ins. Co.*, 507 S.W.3d 219, 226 (Tex. 2016) (orig. proceeding) (per curiam); *In re Xeller*, 6 S.W.3d 618, 626 (Tex. App.—Houston [14th Dist.] 1999, orig. proceeding). However, "[a] reasonably tailored discovery request is not overbroad merely because it may include some information of doubtful relevance." *In re Am. Optical Corp.*, 988 S.W.2d 711, 713 (Tex. 1998) (orig. proceeding).

### *Application*

#### *RFPs 48 and 49*

In its response to Dwight Capital's petition for writ of mandamus, Terravista withdrew RFPs 48 and 49. "Unilateral and unenforceable withdrawal of discovery, without any assurances that the withdrawal is definite, and at the very hour appellate courts are looking, does not moot a discovery dispute." *In re Contract Freighters, Inc.*, 646 S.W.3d 810, 813–14 (Tex. 2022) (orig.

proceeding) (per curiam) (internal quotation marks omitted). Because Terravista has not cited any "enforceable assurances via a Rule 11 agreement, a binding covenant, or anything else that would provide sufficient certainty that they would not refile the same or similar requests if the Court dismissed" Dwight Capital's complaints about RFPs 48 and 49, those complaints continue to present a live controversy. *Id.*

Dwight Capital contends that RFPs 48 and 49 are overbroad because they are not reasonably tailored to the subject matter of this dispute. The trial court's order granting the motion to compel as to RFPs 48 and 49 requires Dwight Capital to produce documents "relating to prior regulatory action" either brought or threatened against Dwight Capital "by any state or federal agency having jurisdiction over [Dwight Capital's] operations concerning conduct alleged to have occurred between March 2017 and May 2019." Because these provisions of the order require Dwight Capital to produce documentation of investigations conducted by *any* state or federal agency, they are not limited by subject matter. *See In re BCL St. Anthony*, 2024 WL 604752, at *4. Complying with these provisions would, for example, require Dwight Capital to turn over documentation related to regulatory actions in employment matters that fall under the purview of the Equal Employment Opportunity Commission or the Texas Workforce Commission, even though that information would plainly have no relevance to Terravista's claims. *See id.*; *see also In re Nat'l Lloyds Ins. Co.*, 449 S.W.3d at 488; *In re Allstate Cnty. Mut. Ins. Co.*, 227 S.W.3d 667, 668–69 (Tex. 2007) (orig. proceeding) (per curiam) (granting mandamus relief where requested discovery "ha[d] no relation or relevance to the scope of the parties' dispute").

Because the trial court's order as to RFPs 48 and 49 "could have been more narrowly tailored to avoid including tenuous information and still obtain the necessary, pertinent information," the trial court abused its discretion by overruling Dwight Capital's objections to

RFPs 48 and 49 and compelling it to produce documents responsive to those requests. *See In re CSX Corp.*, 124 S.W.3d at 153. Additionally, Dwight Capital lacks an adequate remedy on appeal. *See In re BCL St. Anthony*, 2024 WL 604752, at *4. We therefore conditionally grant Dwight Capital's petition for writ of mandamus as to RFPs 48 and 49.

*RFPs 46 and 47*

Dwight Capital's challenges to RFPs 46 and 47 are included within its complaints about RFPs 48 and 49. But unlike the portions of the trial court's order that compel responses to RFPs 48 and 49, the portions of the order that compel responses to RFPs 46 and 47 are specifically limited to actual or threatened HUD investigations. Dwight Capital's petition does not present any independent argument or authority to support a conclusion that these narrower categories of information are facially overbroad or otherwise not reasonably tailored to the subject matter of this dispute. *See, e.g.*, *In re ConocoPhillips Co.*, 405 S.W.3d 93, 95 (Tex. App.—Houston [14th Dist.] 2012, orig. proceeding) (relator bears the burden to establish abuse of discretion). Accordingly, Dwight Capital has not shown it is entitled to mandamus relief as to RFPs 46 and 47.

*RFPs 50, 51, and 52*

The portions of the trial court's order compelling responses to RFPs 50, 51, and 52 require the production of nonprivileged documents related to a "$16 million civil money penalty," "24 life-of-loan indemnifications," and a "corrective action plan" that Dwight Capital agreed to as part of a September 2022 settlement with HUD, along with any subsequent documents showing Dwight Capital's compliance with or breach of that settlement. These provisions of the order are at least facially limited by both time and subject matter. We must therefore determine whether the trial court could have reasonably concluded that the information Terravista sought was both relevant

and "reasonably calculated to lead to the discovery of admissible evidence." *In re Nat'l Lloyds*, 532 S.W.3d at 808.

In determining whether information is discoverable, "[t]he phrases 'relevant to the subject matter' and 'reasonably calculated to lead to admissible evidence' are to be 'liberally construed to allow the litigants to obtain the fullest knowledge of the facts and issues prior to trial.'" *In re Sun Coast Res., Inc.*, 562 S.W.3d 138, 146 (Tex. App.—Houston [14th Dist.] 2018, orig. proceeding) (quoting *Ford Motor Co. v. Castillo*, 279 S.W.3d 656, 664 (Tex. 2009)). "Courts measure the scope of discovery by the live pleadings regarding the pending claims." *In re Methodist Primary Care Grp.*, No. 14-17-00299-CV, 2017 WL 3480292, at \*2 (Tex. App.—Houston [14th Dist.] Aug. 14, 2017, orig. proceeding) (per curiam).

Dwight Capital argues that the HUD settlement: (1) "had absolutely nothing to do with Terravista" or its allegations in this dispute; (2) did not result in a finding of liability or fault against Dwight Capital; and (3) was "confidential" and "sensitive." It contends that the trial court therefore abused its discretion by ordering Dwight Capital to produce information about the HUD settlement. As support for this argument, Dwight Capital primarily relies on our sister court's opinion in *In re Nolle*, 265 S.W.3d 487 (Tex. App.—Houston [14th Dist.] 2008, orig. proceeding).

In *Nolle*, TSI sued Kerry (a former employee of TSI) and Kerry's new company, Full Staff, "alleging breach of the confidentiality and non-competition clauses of [Kerry's] contract [with TSI], misappropriation of trade secrets," and other tort claims. *Id.* at 489. Full Staff filed a motion to compel discovery responses about a Florida lawsuit that had been filed against TSI's owner, Nolle, by Nolle's former employer, MSN. *Id.* at 489–90. Full Staff argued that the information it sought about the Florida lawsuit would "support its affirmative defenses of unclean hands and

estoppel." *Id.* at 489–90, 494. The trial court granted Full Staff's motion to compel, and Nolle sought mandamus review.

In concluding that the trial court abused its discretion by compelling discovery about the Florida lawsuit, the *Nolle* court noted: (1) the Florida lawsuit against Nolle was based on "a completely separate employment relationship, governed by a separate contract"; (2) Full Staff's requested discovery would, "[a]t most . . . uncover MSN's allegations of wrong-doing against Nolle, which are not admissible to prove or disprove any of Nolle's allegations of wrong-doing against Kerry and Full Staff"; and (3) because the Florida case was dismissed for lack of jurisdiction over Nolle, "nothing in that suit could have given Nolle knowledge of any of the substantive legal claims involved, even if they had been identical to those in the present case." *Id.* at 494–95.

*Nolle* is distinguishable for several reasons. First, Full Staff sought evidence of prior claims *against* Nolle to defend itself against claims brought *by* Nolle/TSI. *Cf. id.* Here, in contrast, both the HUD settlement and this lawsuit involve claims directly against Dwight Capital. Second, unlike the Florida lawsuit in *Nolle*, the allegations that led to the HUD settlement were not dismissed for lack of jurisdiction or other procedural grounds, and there is no indication that Dwight Capital lacked knowledge of the substantive legal claims involved in that dispute. *Cf. id.* at 494. Third, while Dwight Capital's CEO, Siegel, attested below that the HUD settlement did not arise out of the relationship between Terravista and Dwight Capital, Terravista noted that the timing of the settlement suggests that HUD's investigation may have overlapped with the events at issue in this case.

The *Nolle* court noted, moreover, that Texas courts have permitted "discovery of material related to other lawsuits and complaints" where "the information sought had a direct, material

connection to the instant litigation." *Id.* at 496. The trial court could have reasonably concluded that such a connection existed here. Terravista alleged, for example, that Dwight Capital promised to secure HUD loans and failed to do so; negligently handled the bridge loan process; knowingly concealed "relevant facts concerning [Dwight Capital's] relationships" with affiliates that it encouraged or coerced Terravista to work with; told Terravista that proceeding with the HUD loan process would require Terravista to make representations to HUD about its financial condition that Dwight Capital knew were false; caused or contributed to the events that resulted in the potentially disqualifying deterioration in Terravista's financial condition; and conspired to defraud Terravista out of ownership of the HUD Portfolio. Dwight Capital itself describes Terravista's claims as:

> In essence, Terravista accused Dwight Capital of misrepresenting what was needed to secure HUD approval, "conspiring" with others to stall the application process, undermining Terravista's ability to obtain HUD 223(f) financing, and locking Terravista out of the process in an alleged scheme to take ownership of the HUD Portfolio from Terravista.

Despite Dwight Capital's insistence to the contrary, the record does not establish that these claims are wholly dissimilar from the allegations that led to the HUD settlement. The Federal Register shows, for example, that the HUD settlement arose out of allegations that Dwight Capital violated requirements applicable to FHA lenders[4] by "fail[ing] to disclose identity of interest ('IOI') relationships," "submitt[ing] false information" and making "false statements" to FHA and to HUD's Mortgagee Review Board, and engaging in "prohibited business transactions" and "business practices that do not conform to generally accepted practices of prudent mortgagees." The trial court could have reasonably concluded that this description was meaningfully similar to Terravista's claims.

---

[4] As noted above, citations in Dwight Capital's petition for writ of mandamus identify the Section 223(f) program that Terravista sought to use as an FHA mortgage insurance program.

In light of the similarities between Terravista's live claims and the allegations that led to the HUD settlement, we do not believe the trial court had no choice but to conclude the HUD settlement involved only "activities beyond those at issue in the case." *See In re Alford Chevrolet-Geo*, 997 S.W.2d at 180 n.1; *see also Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding) ("The relator must establish that the trial court could reasonably have reached only one decision."). Furthermore, unlike discovery requests that have previously been rejected as "impermissible fishing expeditions," RFPs 50, 51, and 52 do not request information about "a list of lawsuits and . . . records from all over the country . . . with the hope of finding similarly situated" events. *Cf. In re Contract Freighters*, 646 S.W.3d at 815. Instead, they request documentation about a single, identifiable settlement. On this record, the trial court could have rationally concluded RFPs 50, 51, and 52 had a reasonable expectation of obtaining information that will aid in the resolution of this dispute even if it credited Seigel's assertions that the HUD settlement did not arise out of Dwight Capital's dealings with Terravista. *Cf. id.* at 814 (describing attributes of proper discovery requests).

Finally, as noted above, Dwight Capital contends in this court that the HUD settlement was confidential and sensitive. It did not raise that argument in its response to Terravista's motion to compel, and neither Siegel's affidavit nor the Federal Register's description of the HUD settlement support it. Similarly, while Dwight Capital contends here that "[f]ar less burdensome discovery methods will confirm that the 2022 HUD settlement had nothing to do with Terravista or its Section 223(f) loan application," it did not present any evidence below to establish that the requested discovery was unduly burdensome. *See In re Alford Chevrolet-Geo*, 997 S.W.2d at 181. It therefore did not establish its right to mandamus relief on these grounds. *See In re Allstate Fire & Cas. Ins. Co.*, 617 S.W.3d 635, 646 (Tex. App.—Houston [14th Dist.] 2021, orig. proceeding).

For these reasons, we deny Dwight Capital's petition for writ of mandamus as to RFPs 50, 51, and 52.

## CONCLUSION

We conditionally grant Dwight Capital's petition for writ of mandamus as to the portions of the trial court's order that overrule Dwight Capital's objections to RFPs 48 and 49 and compel it to comply with those requests. We deny the remainder of Dwight Capital's petition.

We direct the trial court to, no later than fifteen days from the date of this opinion, vacate the portions of its January 15, 2025 Order on Terravista's Motion to Compel that order Dwight Capital to comply with RFPs 48 and 49. We are confident the trial court will comply, and the writ of mandamus will issue only in the event we are informed it does not.

Lori I. Valenzuela, Justice